## Court of Appeals.

### February, 1903.

## THE PEOPLE v. LUIGI FILIPPELLI.

### (173 N. Y. 509.)

1. MURDER—DEFENSE OF JUSTIFIABLE HOMICIDE—TRIAL—CHARGE TO JURY.
    Upon the trial of a charge of murder the court charged: "To establish the defense of justifiable homicide it is the duty of one engaged in a quarrel to avoid an attack and not become the aggressor unless other means are unavailable, and if you find that the defendant in this case having, on the afternoon of the 22d of October,

been engaged in a quarrel with the deceased, and desiring to continue that quarrel descended from the house of Bernardino Marotta to the street, and knew that the deceased was on the street, and with the intention of continuing that quarrel and for the purpose of making his quarrel effective took with him a dangerous weapon, and if under those circumstances the defendant sought out the deceased in the public street and entered upon the quarrel which had been interrupted, even though the deceased, under such circumstances, merely drew a revolver, the defendant may be regarded as the assailant and the wrongdoer, and his action in stabbing the deceased is not justifiable homicide. Held, no error. (VANN, J., dissenting, on the ground that the "dangerous weapon" was but a pen-knife.)

2. SAME.

The strict rule as stated in England that "no man shall justify the killing of another by pretense of necessity unless he were himself without fault in bringing that necessity upon himself" has not been accepted in the later cases in this country.

3. SAME—SELF-DEFENSE.

If one takes life, though in defense of his own life, in a quarrel which he himself has commenced with the intent to take life or inflict grievous bodily harm, the jeopardy in which he has been placed by the act of his antagonist constitutes no defense whatever, but he is guilty of murder. But if he commenced the quarrel with no intent to take life or inflict grievous bodily harm, then he is not acquitted of all responsibility for the affray which arose from his act, but his offense is reduced from murder to manslaughter.

APPEAL from a judgment of the Court of General Sessions of the county of New York, rendered February 21, 1901, upon a verdict convicting the defendant of the crime of murder in the first degree. The facts, so far as material, are stated in the opinion.

Nathaniel Cohen, for appellant.

William Travers Jerome, district attorney (Howard S. Gans, of counsel), for respondent.

CULLEN, J.: The appellant was convicted of murder in the first degree in having killed one Michael Carrafiello on October 22, 1900, by stabbing him in the bowels with a knife. The facts of the case lie within a comparative narrow compass. The deceased and the witness Decicco, on the day of the homicide, went from Bridgeport, Conn., where they were then residing, to the city of New York, and about 2 o'clock in the afternoon reached the apartment of an acquaintance, Bernardo Marotta, in First avenue near One Hundred and Fifteenth street. There they found Marotta, his wife and the appellant. While in this apartment the parties had some beer, and after a time Mrs. Marotta demanded from the deceased payment of some money which the latter owed to her. The deceased stated either that he was unable or unwilling to pay his debt. Some words ensued between them, when the defendant intervened in the dispute. There is a conflict in the evidence as to what thereupon took place. The defendant and Marotta and his wife testified that the deceased drew a revolver and threatened to shoot the defendant. Decicco, the companion of the deceased, testified that the defendant drew a revolver, and that the deceased had none. However this may be, it appears that no blows were struck, nor weapons used, and that Marotta took the defendant away and shut him up in an adjoining room. After a short while the deceased, Decicco and Marotta went together down into the street and remained for some time on the sidewalk. Here again witnesses disagree as to what took place. Marotta and his wife and their son, a boy about eleven years old, say that the deceased drew his revolver and threatened the defendant, who appeared at the window of the room above, and also sent by the boy a challenge to the defendant to come to the street, when he (the deceased) would "fix him like Christ on the cross." Decicco denied any occurrence of this character, and testified that the defendant brandished a revolver from the window. While standing on the sidewalk one De Feo joined

the party, and the deceased and Decicco went with him to his apartments in One Hundred and Fifteenth street, where they met Angelo Testa. There they played cards and drank beer. Between 7 and 8 o'clock in the evening all these persons went out of the house and stood on the sidewalk at the corner of One Hundred and Fifteenth street and First avenue, listening to music given at a political meeting in that vicinity. While there Marotta passed by on his way to a saloon to get beer. The deceased stepped away from his companions and spoke to Marotta and at this time the defendant approached him and inflicted the fatal wound. The occurrence was of the briefest duration, but as to its details there is the sharpest conflict between the witnesses. The three companions of the deceased (Decicco, Testa and De Feo) testified that the defendant approached the deceased and stabbed him in the abdomen without warning or altercation. The defendant and Marotta testified that the deceased seized the defendant by the coat and drew a revolver, and that thereupon the defendant struck him with the knife. The defendant testified that he was afraid of the deceased, and that when he saw the latter he opened his knife and put it opened into his pocket. After striking the blow the defendant ran away through the hallway and up the stairs of an adjacent house, to the roof, where he was apprehended by a police officer, who there found the knife which the defendant had thrown away. No revolver was found on the deceased and his companions testified that he had none. The defendant was brought into the presence of the deceased, who identified him as the man who had inflicted the wound. The deceased died the following day.

From this summary of the evidence it will be seen that the case presented a clear and well-defined question of fact to be determined by the jury and that question has been resolved against the defendant. If the testimony of the companions of the deceased was believed—that the defendant stabbed the deceased without altercation or anything occurring at the time

to excite passion or anger—it cannot be denied that the jury could justly infer the premeditation and deliberation necessary to constitute murder in the first degree under our statute. (Leighton v. People, 88 N. Y. 117; People v. Majone, 91 N. Y. 211; People v. Conroy, 97 N. Y. 62.) In the Conroy case it is said: "If a person is undisturbed by sudden and uncontrollable emotions, excited by an unexpected and observable cause, and is in the possession of his usual faculties, it will be presumed that his actions are prompted by reason and are the result of causes operating upon his mind and deemed sufficient by him to inspire his action. A sane person, meeting a stranger upon the street, and in the absence of a sudden impulse produced by an observable cause, without words of explanation or warning, immediately drawing a deadly weapon and therewith causing death, unquestionably brings himself within then penalties prescribed for the punishment of the crime of murder in the first degree." It is true that if the testimony of the defendant himself and of Marotta was credited the affray bore an entirely different aspect and the jury might have found that the homicide was either justifiable or constituted manslaughter only. But the question of which set of witnesses told the truth, those for the People or those for the defendant, was pre-eminently one for the jury. The jurors saw the witnesses and heard them testify, and from their appearance, demeanor and manner of testifying was in no small measure to be determined the credibility which should properly be accorded them. In such a case the finding of a jury should not be set aside unless we see that error has been committed or injustice done. Section 528 of the Code of Criminal Procedure provides: "When the judgment is of death, the Court of Appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." But it is the settled law "that in determining whether a new trial shall be

granted under it, it is not the province of this court to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such a case, and that with its decision the court may not interfere unless it reaches the conclusion that justice has not been done." (People v. Decker, 157 N. Y. 186.) It is further to be observed that there are several circumstances which tend to largely discredit the defendant's version of the affray. No pistol was found on the deceased. It is singular that if the deceased drew a pistol in Marotta's apartments, Marotta should have removed the defendant from the apartment and shut him up in another room and have accompanied the deceased to the street, and remained there apparently in amicable intercourse with him. The defendant admits that before he reached the deceased he opened his knife and had it opened in his pocket. The fact that the weapon used by the defendant was only a pocket knife was doubtless a circumstance to be considered in his favor, but opening it in advance of the affray militates against him. In the light of the evidence we cannot say that the verdict of the jury was wrong or that justice requires that a new trial shall be granted.

It is contended that the trial court erred in its instructions to the jury. At the request of the prosecution the court charged: " To establish the defense of justifiable homicide it is the duty of one engaged in a quarrel to avoid an attack and not become the aggressor unless other means are unavailable, and if you find that the defendant in this case having, on the afternoon of the 22d of October, been engaged in a quarrel with the deceased, and desiring to continue that quarrel, descended from the house of Bernardino Marotta to the street, and knew that the deceased was in the street, and with the intention of continuing that quarrel, and for the purpose of making his quarrel effective, took with him a dangerous weapon, and if under those circumstances the defendant sought out the deceased in the public street and entered upon.

the quarrel which had been interrupted, even though the deceased, under such circumstances, merely drew a revolver, the defendant may be regarded as the assailant and the wrongdoer, and his action in stabbing the deceased is not justifiable homicide," to which the defendant duly excepted. It is urged that the charge was erroneous, in that it ignored the consideration that to deprive a person who commences a quarrel of the right to self-defense the quarrel must be brought on or the assault committed with a felonious intent either to kill or inflict grievous bodily harm on his antagonist. What are the rights and what are the responsibilities of the original aggressor who takes life in a quarrel have been the subject of much discussion by the text-writers and in judicial opinions. The strict rule has been stated in England that "No man shall justify the killing of another by pretense of necessity unless he were himself without fault in bringing that necessity upon himself." (1 Hawkins P. C. 82, 83; see, also, 1 East P. C. 278.) This extreme doctrine has not been accepted in the later cases in this country. It has been held that if the defendant withdraw from the quarrel which he has provoked and this is made known to his antagonist and after such withdrawal his antagonist assails him with intent to take his life or inflict grievous bodily harm, he may lawfully defend himself. (Stoffer v. State, 15 Ohio St. 47.) The doctrine has been further limited even where the original aggressor has not entirely withdrawn from the quarrel, but the quarrel was commenced with no intention to either take the life of the opposite party or inflict upon him grievous bodily harm. (Wallace v. U. S., 162 U. S. 466; see Adams v. People, 47 Ill. 376; Reed v. State, 11 Tex. App. 509.) In the Wallace case it is said: "Where a difficulty is intentionally brought on for the purpose of killing the deceased, the fact of imminent danger to the accused constitutes no defense; but where the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief

of imminent danger he inflicts a fatal wound, it is not murder." But this must not be construed as implying the proposition that under the circumstances last stated the killing would be justifiable homicide. In the case then before the court the prisoner had been convicted of murder and the question under review was the exclusion of certain testimony, which it was claimed tended to reduce the crime from murder to manslaughter, and the statement quoted was made with reference to that question. This appears from the fact that the Illinois case and the Texas case cited are quoted with approval. The doctrine of these cases is very plain. In the Illinois case the court said: " That where the accused sought a difficulty with the deceased for the purpose of killing him, and in the fight did kill him, in pursuance of his malicious intention, he would be guilty of murder; but that if the jury found that the accused voluntarily got into the difficulty or fight with the deceased, not intending to kill at the time, but not declining further fighting before the mortal blow was struck, and finally drew his knife and with it killed the deceased, the accused would be guilty of manslaughter, although the cutting and killing were done in order to prevent an assault upon him by the deceased or to prevent the deceased from getting the advantage of him in the fight." In the Texas case the court said of self-defense: " It may be divided into two general classes, to wit, perfect and imperfect right of self-defense. A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong—if he was himself violating or in the act of violating the law—and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself which was superinduced or created by his own wrong, then the law justly limits his right of self-defense and regulates it according to the magnitude of his

own wrong. Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defense. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then indeed the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offense which but for such acts would never have been occasioned. . . . If he was engaged in the commission of a felony and, to prevent its commission, the party seeing it or about to be injured thereby makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slay his assailant, the law would impute the original wrong to the homicide and make it murder. But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be manslaughter under the law." The doctrine of these cases seems to us entirely just and to be as favorable to a defendant as can be upheld consistently with proper protection of human life. Tersely stated it is that if one takes life, though in defense of his own life, in a quarrel which he himself has commenced, with the intent to take life or inflict grievous bodily harm, the jeopardy in which he has been placed by the act of his antagonist constitutes no defense whatever, but he is guilty of murder. But if he commenced the quarrel with no intent to take life or inflict grievous bodily harm, then he is not acquitted of all responsibility for the affray which arose from his act, but his offense is reduced from murder to manslaughter.

Tested by this rule the charge of the trial court was not erroneous. Some parts of it are subject to critiscism as being indefinite. The first proposition, that " to establish the offense of justifiable homicide, it is the duty of one engaged in a quarrel to avoid an attack and not become the aggressor, unless

other means are unavailable," stated unquestionably the correct rule of law. (People v. Sullivan, 7 N. Y. 396.) In the second proposition, "and if you find that the defendant in this case . . . with the intention of continuing that quarrel, and for the purpose of making his quarrel effective, took with him a dangerous weapon, and if, under those circumstances, the defendant sought out the deceased in the public street and entered upon the quarrel which had been interrupted, even though the deceased, under such circumstances, merely drew a revolver, the defendant may be regarded as the assailant and the wrong-doer and his action in stabbing the deceased is not justifiable homicide," there is a lack of clearness. It is not entirely plain what is the meaning of the expression " and for the purpose of making his quarrel effective." If this is to be understood as meaning with the purpose of taking the life of the deceased or inflicting upon him grievous bodily harm, then, concededly, the charge was proper. I am not sure that, taken in connection with the qualification stated by the court, that the jury should find that the deceased took with him a dangerous weapon; such is not the fair meaning of the charge. But assuming that the charge is capable of the interpretation that if the jury should find that the defendant renewed the quarrel, whether with or without intent to take life or inflict grievous bodily harm, the killing of the deceased was not justifiable homicide, it was nevertheless correct, for, under the doctrine of the cases cited, the absence of intent to take life or work grievous bodily injury would not make the subsequent act of the defendant justifiable homicide, but only reduce his offense to manslaughter. As to this grade of crime, the instructions of the trial court were full and fair.

The judgment should be affirmed.

VANN, J.: I dissent upon the ground that there was no evidence authorizing the jury to find that the defendant " took with him a dangerous weapon," because the knife used was but

a penknife that he had carried in his vest pocket for months. The expression quoted was an essential element of the proposition charged, and the exception thereto requires a reversal.

PARKER, Ch. J., BARTLETT, HAIGHT, MARTIN and WERNER, JJ., concur with CULLEN, J.; VANN, J., reads dissenting memorandum.

Judgment of conviction affirmed.