[Crim. No. 3226.   Second Appellate District, Division Two.—September 13, 1939.]

THE PEOPLE, Respondent, v. RUTH INGRUM, Appellant.

Morris Lavine for Appellant.

Earl Warren, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

WOOD, Acting P. J.—Defendant was charged by information with the crime of murdering Victor M. Paul on January 13, 1939. She entered pleas of not guilty and not guilty by reason of insanity and admitted the truth of the additional charge contained in the information that she had previously been convicted of a felony. A jury returned a verdict finding her guilty of murder of the first degree and fixing her punishment at life imprisonment. The jury also found that she was sane at the time of the commission of the offense. The appeal is from the judgment of conviction.

Defendant argues that the evidence is insufficient to sustain the judgment. She contends that she shot Mr. Paul in self-defense and that the killing was justifiable and excusable; that if it be held that the killing was not justifiable or excusable, the evidence shows the commission of no offense greater than manslaughter.

The prosecution points to evidence in the record which fully sustains the verdict of the jury. The decedent, who was a deputy sheriff of Los Angeles County, met defendant while they were passengers on a bus travelling to El Paso, Texas. Defendant informed decedent that she had been convicted of robbery in Oklahoma, had served part of her term and been paroled, but had violated the terms of her parole and had been returned to the penitentiary from which she had escaped. Notwithstanding this information decedent asked her if she were a good cook and requested her to return to California and live with him. Thereupon decedent bought tickets for their return to California and they commenced to live together as husband and wife, and although they were not married, continued to live together in Norwalk until defendant killed decedent.

A witness for the prosecution, Edith Winget, also known by the nickname "Patsy", testified that in the evening of January 12, 1939, defendant and the witness drove by the house occupied by defendant and decedent and, finding no light in the house, drove on and visited several cafes and

beer parlors, subsequently returning to defendant's home at about 3 o'clock in the morning of January 13th. They went into the house, turned on the light and awakened decedent. After a few moments decedent said, "Quit", and pulled the bed covers over his head after defendant had pulled the covers down. Decedent used some profanity. Defendant said to the witness, "Come on, Patsy, let's get out of here" and said to decedent, "God damn it, so you are still mad." The witness and defendant then left the house and visited other beer parlors and cafes, the last place being visited at approximately 9:30 A. M. on January 13th. They returned to the residence occupied by decedent and defendant at about 3 o'clock in the afternoon of January 13th. Seeing unwashed dishes on the table defendant said, "Someone has surely cooked for him". Defendant then went out the back door.

Defendant found decedent at the house next door and the occurrences that took place there are related by other witnesses. Decedent had gone next door at about 11 o'clock in the morning and had consumed sandwiches and coffee. When she found decedent, defendant angrily ordered him to get out, using unprintable language. Decedent pleaded with defendant to wait for him and not be angry.

Edith Winget further testified that soon thereafter she observed defendant and decedent in the kitchen of their home engaged in a conversation in which decedent accused defendant of having been drinking. This was denied by defendant but decedent answered, "Nevertheless you must sleep it off". Decedent did not appear to be angry. Defendant and decedent walked toward the bedroom and the witness went into the living room. The doors were open and she heard defendant tell decedent that she could not get up because she did not have any clothes on. The witness heard no sounds of any blows or any struggle in the bedroom. Decedent remained in the bedroom five or ten minutes and then went into the kitchen. Both defendant and decedent appeared to the witness to be sober. In the course of the ensuing conversation between decedent and the witness decedent said, "I can't help it, I am through with her". Presently the witness heard the sound of steps of bare feet in the hall, apparently coming from the bedroom. She saw decedent take one step toward the hallway from which the sound of footsteps was coming and almost immediately after she heard

one shot fired by defendant. Immediately the witness turned and saw decedent fall. Then she heard two more shots. Between the second and third shots she heard decedent say, ''For Christ sake, Pat, get a doctor''. At that time decedent was on the floor and defendant asked, ''Are you through with me?'' To this decedent replied, ''No darling, you know I am not''. The witness then asked defendant for the keys to the car telling defendant that she was going to take decedent to the hospital, whereupon defendant told the witness to go ahead and tell him what she had to say to him; that she was going to kill decedent and then kill herself. Defendant did not offer to assist the witness to get a doctor.

Margaret Burrell, who lived in the house next door, testified that she heard the three shots fired, that there was a pause after the first shot but the other two shots were fired in rapid succession. After hearing the shots she went to defendant's house and found decedent lying on the porch. The witness asked, ''My God, Gloria, is he dead?'', to which defendant replied, ''No, he isn't dead, but I am going to shoot the dirty son of a bitch until he is''. (It appears that defendant was commonly called Gloria.) The witness further testified that defendant said, addressing her remarks to decedent, ''I will teach you to call me a dirty little whore''.

It was shown in evidence that a window opened from the bedroom and that defendant could have easily opened the window and escaped from the house without risk of injury to herself. At the time she seized the revolver from the closet and went down the hall toward decedent she was unclothed except for a blouse covering the upper part of her body.

Defendant's contention that the homicide was excusable and justifiable is based upon her own testimony given at the trial in which she stated that decedent had beaten her on the head in the bedroom, jerked her up and down on the bed, and had threatened to kill her; that she only wanted to leave the house, and that she shot decedent in fear for her life. The jury was not bound to accept as true the testimony of defendant, which is refuted in large part by the testimony of other witnesses and by the physical facts shown in evidence. Other witnesses did not hear the sounds of the beating and did not find marks upon defendant's body. The window was available for her escape if she in fact wanted to leave the premises. Instead of leaving by the window defendant chose to seize the weapon and carry it down the

hall toward decedent. From the testimony of the witness Winget it appears that two of the shots were fired after the decedent had fallen to the floor. ██ Moreover, in order to justify the killing of decedent on the ground of self-defense it was not sufficient to establish that defendant believed her life was in danger but it must have appeared that she had reasonable cause to believe that she was in imminent danger of losing her life or suffering great bodily injury. (Sec. 197, Pen. Code; *People* v. *Loomis,* 86 Cal. App. 768 [261. Pac. 512]; *People* v. *Ortiz,* 63 Cal. App. 662 [219 Pac. 1024].) There is ample evidence in the record to support the conclusion of the jury that defendant without justification killed decedent maliciously and intentionally.

The judgment is affirmed.

McComb, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 26, 1939, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 11, 1939.