### Johnson v. Commonwealth.

Feb. 7, 1941.

Rogers & Rogers for appellant.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Near 8 o'clock P. M. on July 21, 1940, appellant, Jack Johnson, in Boone County, Kentucky, shot and killed Lucian Black. He was later indicted for murder, and on his trial in that court he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for ten years. His motion for a new trial was overruled, and from the judgment pronounced on the verdict he prosecutes this appeal, relying chiefly and almost entirely on the alleged insufficiency of the testimony to support the verdict—and, as a consequence thereof, his motion for a directed acquittal should have been sustained. A most tremendous and laborious effort is made on his behalf by his learned counsel to convince us of the correctness of the ground indicated and argued by them, and which we do not criticise, since counsel are justified in doing so on behalf of their client when their argument is based upon their interpretation of the testimony without misrepresenting it, which latter appears not to have been done by appellant's counsel in this case. The argued ground calls for a sufficient statement of the facts, as testified to by the witnesses, as may be necessary to a determination of the question.

Appellant and his victim were each married and lived in the same neighborhood and appellant, until about three months before the homicide, boarded at the home of his victim for some considerable time; he then being separated from his wife, or a widower. The family of deceased consisted of himself, wife and two children, they having been married some five or six years and lived upon a farm. Appellant until a short period before the homicide was also a farm hand employed by different farmers in the neighborhood, but after leaving the residence of the deceased in April,

1940, he secured a job as a truck driver, in which he was engaged on the fatal occasion.

There is a settlement or village in Boone County which goes by the name of "Big Bone." The day of the week on which the homicide was committed was Sunday, and both appellant and his victim went to Big Bone on that afternoon, where it was supposed a baseball game would be played. Near the ball grounds was a roadhouse run by a man named Miller. Appellant rode to Big Bone in the automobile of Cliff Stevens, the latter driving it. There were two others in the same car, one of whom was Bill Black, an uncle of deceased, who had no family at the time and appears to have lived around amongst or with friends or relatives. He was more or less a consumer of alcoholic drinks, and on this occasion he carried along with him a 32-calibre pistol. After arriving at Big Bone appellant and Bill Black concluded to imbibe some intoxicants and they went to Miller's place to gratify that desire, where they found deceased, who had preceded them to that place; but there is no evidence that he was in any wise intoxicated, nor is there any proof that appellant consumed an excessive amount of drinks. Before Bill Black and appellant entered the Miller roadhouse, the pistol of Black was obtained by appellant, who had it in his possession on the fatal occasion hereinafter described. He says that he obtained possession of it because Bill Black on a former occasion had a difficulty with Miller, the proprietor of the place, when the latter ordered him, Black, to never again appear on his premises; but Black in testifying for the prosecution denied that statement and testified that his pistol was delivered to appellant because the latter said: "He wanted to borrow it, said a fellow had it in for him down there, he was expecting something." At any rate, while in the establishment of Miller appellant testified that: "He (deceased) told me before he left down there (Big Bone) that afternoon, he asked me if I would meet him at the end of Mr. Hill's Lane, that he had some things he wanted to thrash out, and he asked me if I would meet him there, I told him I would. He said 'will you meet me there around dark?' To which I answered, 'I will be there.'" The end of Hill's Lane was the point where it intersected a public highway and is some distance from Big Bone, and en route to their respective abodes.

Somewhere near 6 o'clock on the fatal afternoon, Stevens gathered his crowd into his car and left Big Bone for their several homes, but en route to the end of Hill's Lane appellant shot his pistol at a target by the side of the road, and when the parties arrived at the appointed place they stopped, when all of them except Bill Black got out of the car, awaiting the arrival of the deceased pursuant to the engagement previously made with appellant at Big Bone. In the meantime deceased's stepfather-in-law, whose name is Hill, became considerably intoxicated, and when deceased left Big Bone he put his stepfather-in-law into his car and carried him home, the route taking him through and past the arranged meeting point—his stepfather-in-law residing beyond it. He was gone some thirty minutes, during which time he ate supper at his stepfather-in-law's home. On departing therefrom to meet the engagement he had with appellant, he put into his car a double-barrel shotgun belonging to his stepfather-in-law, and he also had a billy in the car when he returned to the end of Hill's Lane. Immediately upon his arrival there appellant stepped up by the side of the automobile of deceased, who was sitting behind the wheel on the opposite side, and the two engaged in a conversation which immediately grew very bitter, and in which each of them accused the other of undue intimacy with the other's wife—a fact which deceased appears to have lately discovered and to which he attributed his wife's separation from him which occurred in April preceding the homicide. On leaving her husband the wife went to the home of her mother and stepfather, Mr. Hill. She carried her two children with her, and her husband appears to have thereafter endeavored to reconcile her and to induce her to return to him.

At least two witnesses, and possibly more, testified to positive incriminating acts and words establishing the fact of appellant's intimacy with the wife of deceased, both during the time he was boarding at their residence prior to the separation, and also after that time, even to such an extent as to provoke on the part of Mr. Hill (and, perhaps, his wife) the forbidding of his continuing his visits to their residence or upon their daughter, the decedent's wife. Proof was also introduced by the commonwealth to show that appellant procured a friend to induce the separated wife of deceased

to meet him clandestinely, and it may fairly be said that the testimony abundantly establishes the fact of such intimacy, or at least to prove efforts on the part of appellant to bring about such intimacy, which was testified to by some of the witnesses testifying for the commonwealth, but which he denied on his trial. Also, the assistant cashier of a bank at Burlington testified that after the killing appellant stated to him in giving a history of the unfortunate occurrence that deceased, when he arranged for the meeting at the end of Hill's Lane with a view of talking things over, said to appellant that: "I want you to meet me and we will settle our troubles."

After deceased and appellant began talking at the meeting place and after their conversation advanced to a most angered stage, with charges and counter charges being preferred, appellant testified that deceased said to him: "If you will disarm yourself I will get out and give you a good thrashing." Whereupon he (appellant) deposited the pistol of Bill Black that he was carrying in the car in which he was traveling, and in which the owner of the pistol was then sitting. He then took off his coat, rolled up his shirt sleeves, and prepared himself for battle, but deceased in getting out of the car picked up the shotgun which he had placed therein and endeavored to shoot appellant, but Cliff Stevens was sufficiently near to grab the gun and prevented any fatal results, the load penetrating only one of the pant legs of appellant. Immediately upon the firing of that shot, Cliff Stevens—who was a man of equal physical strength and power of that of deceased—held onto the shotgun in the latter's hands and the two started back down Hill's Lane, which made a more or less sharp curve a short distance from its juncture with the public road. They were, therefore, soon out of sight, the lane being narrow and lined with high weeds and shrubs on either side. Stevens testified that when they first started down the lane away from the scene of the shot fired by deceased from his double-barreled gun, the latter was somewhat rebellious and demanded the release of Stevens' hold on the gun, which was done directly thereafter, and the two continued to travel away from appellant and in an opposite direction from the scene of the difficulty.

Immediately after deceased fired his gun at the

mouth of the lane, appellant went to the car in which he had traveled to the place and snatched from the hands of Bill Black the latter's pistol, and immediately started down the lane in pursuit of Stevens and the deceased, in which he continued to persist—notwithstanding the parties present warned him against doing so, as did also his friend Stevens, after he discovered the pursuit of appellant. Shortly before reaching a point down the lane about 400 feet from the original meeting place where the difficulty first started, appellant overtook his adversary, and Stevens, who was with him, as we have described, and according to witnesses for the prosecution he then had his pistol in his hands and demanded of deceased that he drop his gun and throw up his hands. At that time, and for some distance before arriving at the point where that demand was made, appellant was very close to deceased. The latter saw the drawn pistol of appellant, and he shoved Stevens into a bunch of weeds by the side of the road and hit appellant on the head with his billy, when appellant shot him twice, killing him instantly. Appellant testified that at the time he fired the shot deceased was endeavoring to raise his gun to shoot him, but that broad statement was more or less weakened by his cross-examination and by other testimony, although for the purposes of this case it might be accepted as an established fact.

The record contains much evidence going to prove appellant's intimacy with the wife of deceased which, we repeat, began while he was boarding at the home of deceased and thereafter flourishing to the extent testified to by the witnesses. During the heated quarrel just preceding the shot fired by the deceased at the end of Hill's Lane, appellant, as we have stated, accused deceased of like conduct towards his wife, resulting in the inflaming of the passion of anger of each of them towards the other. Furthermore, while the parties were waiting for the return of the deceased from his trip carrying his wife's stepfather to the latter's home, some of his companions became impatient and suggested that they abandon the arranged meeting and depart for their homes, but deceased objected and said: "No, I aint going. This is going to be settled tonight, somehow."

From the evidence as so related these facts were sufficiently proven to sustain a verdict finding them to be true: (1) That appellant was and had been for some

time intimate with the wife of deceased and that deceased had become aware of it; (2) that appellant thought or pretended to think that the same relationship existed between deceased and his wife; (3) that such beliefs created a smouldering volcano liable to erupt at any time, and that the agreed meeting was, no doubt, supposed by each party, and intended by them, as the time for such eruption; (4) appellant was willing for that to occur and did not object, but agreed to the meeting with his enemy for that purpose; (5) that he thereby willingly consented to engage in a mutual combat with his angered enemy in ancient duel fashion for the settlement of their grievances; and (6) that he followed his belligerent enemy who had traveled 400 feet away from the scene of the first trouble and who was continuing to retreat when overtaken by appellant. As he approached deceased his pistol was then drawn and his actions and words were such as to clearly indicate to the deceased that he was in great danger. So that, even if deceased had then endeavored to draw his double-barrel shotgun on appellant the latter was responsible therefor, since he created the situation justifying deceased in doing so. Therefore, the case clearly and most manifestly comes within the rule—so often declared by this and other courts and denied by none—that one may not shelter under his right of self-defense when he himself brought on the immediate difficulty in which the alleged danger to himself occurred, and that though accused might have availed himself of the right of that defense if he had acted earlier in the melee, yet if his antagonist abandoned that immediate difficulty and was later attacked by defendant in circumstances authorizing the deceased to himself become the aggressor in exercising his right of self-defense, then the crime committed by defendant may not be justified under his like right.

A comparatively late case announcing and unqualifiedly approving that doctrine as a part of the criminal law of this jurisdiction is Lewis v. Commonwealth, 237 Ky. 786, 36 S. W. (2d) 639. Many other prior ones, as well as later ones, could be cited, but they are all to the same effect and no good purpose could be accomplished in incumbering this opinion by doing so.

But learned counsel for appellant cites the case of Privitt v. Commonwealth, 271 Ky. 655, 113 S. W. (2d) 49, and others of like tenor, wherein we held that the

testimony in them conclusively established that the crimes were committed while the accused was clearly within his rights growing out of the self-defense doctrine. In none of those cases did it appear that "Barkis was willin'," as it was made to appear with reference to appellant in this case, nor did it appear in either of them that the accused, after the danger to him was at least temporarily removed, sought the presence of his victim and by his actions and words renewed the difficulty resulting in the commission of the crime charged, as this record clearly shows appellant did.

But it is again argued that the rule as announced by Judge Robertson, speaking for this court in the case of Philips v. Commonwealth, 2 Duv. 328, 87 Am. Dec. 499, and later modified to some extent and partially followed in the case of Bohannon v. Commonwealth, 8 Bush 481, 8 Am. Rep. 474, should be applied in this one. Those cases announce the correct rule that an accused has the right to stand his ground and is not compelled to flee in order to avoid the threatened danger of his adversary; but the Philips case goes further and approves the right of the accused to continue to pursue his adversary—even when the latter is fleeing from the scene—and to kill him if it appeared to the accused to be necessary to entirely remove all danger. That doctrine has long since been discarded by this court and the Philips opinion has been criticised by practically all of the courts of this country. The repudiation of that doctrine was upon the ground that the right of self-defense should be exercised as a last resort to protect one's life or limb from threatened danger about to be inflicted by his antagonist, but to entitle him to that defense he may not manufacture a situation wherein he becomes so imperiled, since in that event he will be considered as inviting the danger that he seeks to repel under the exercise of his right of self-defense.

Human life, and the right of all citizens to live it with their person unmarred and unscarred, is too sacred to establish and give force to any such rule, since the reason for excusing one from punishment when he acts in his necessary self-defense is absent when his adversary abandons the scene and retires therefrom. Also, no one should be allowed to employ the cloak of self-defense when he himself was the producer of the threatened danger to him, and but for which his predicament

would not have happened. We see no necessity for procrastination of the discussion of the instant question, since the testimony is plain, pointed and convincing. It is, therefore, concluded that the principal, and practically the only ground argued for a reversal, is without merit.

The brief criticism of the instructions is likewise so. The chief one is that the court should not have given a murder instruction under the evidence, but with which we do not agree. However, under an unbroken line of decisions we have held that when there was no conviction under that instruction the error in giving it, if any, would not operate to the prejudice of the accused. It is also argued as an objection to the instructions that the court, in defining the term "malice aforethought," first defined "malice," and then defined "aforethought." But the two definitions, when combined, conformed to our approved definition of the term "malice aforethought," composed of the two words separately defined by the court. Manifestly, there could be no prejudicial error in such a departure from the usual course. Moreover, that term applies only to the crime of wilful murder of which the defendant was found not guilty. Therefore, if the course pursued by the court was prejudicially erroneous, the appellant may not complain thereof for the reason hereinbefore stated, i. e., that he was not convicted of the crime to which the definitions complained of were applicable. Upon the whole case we are convinced that there has been no miscarriage of justice in this case, since it is our conclusion that the appellant had a fair and impartial trial.

Wherefore, for the reasons stated the judgment is affirmed.