UNITED STATES, Appellee

v.

CHARLES P. GINN, JR., Corporal, U. S. Army, Appellant

1 USCMA 453, 4 CMR 45

No. 263

Decided July 10, 1952

LT. COL. George E. Mickel, USA, and, 1ST. LT. John D. Calamari, USA, for Appellant.

LT. COL. Paul J. Leahy, USA, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Petitioner was tried by general court-martial in Korea for the offense of premeditated murder in violation of Article of War 92, 10 U.S.C. § 1564. He was found guilty, by exceptions and substitutions, of voluntary manslaughter in violation of Article of War 93, 10 U.S.C. § 1565. He was sentenced on July 17, 1951, to a dishonorable discharge, total forfeiture of pay, and confinement for ten years. The convening authority approved and an Army board of review affirmed. We granted petition for review in order to consider substantial issues of military law raised by petitioner. Disposition of the case requires a summary of the evidence.

In the early evening of May 29, 1951, petitioner was in a headquarters tent of the 558th Transportation Amphibious Truck Company stationed at Inchon, Korea. Corporal McAdoo, the deceased, entered the tent and addressed a general complaint to those present concerning the prices charged by various Korean women for laundry. There were some Korean laundry women present, and the deceased took hold of one of the

women. Petitioner ordered the deceased to release the woman. The deceased replied, "You make me." Following this, there was an interchange of words which led to a fight. After the first sergeant appeared in the tent and a crowd gathered, the fight was resumed outside the tent. The deceased was victorious when he struck petitioner a blow in the nose which knocked the latter to the ground. Petitioner appeared to be unconscious, and remained on the ground for a few minutes. During the fight, the deceased was heard to say, "I'll kill you."

Later, at about 10:30 p.m. or 11:00 p.m. the same day, petitioner was lying on a bunk in his tent with a group of soldiers. The deceased entered the tent and went to the bunk occupied by Sergeant Eaton which was at the end of the tent and opposite to petitioner's bunk. The deceased sat down, spoke to Sergeant Eaton for a while, and then exhibited a P–38 pistol. After displaying the pistol, the deceased replaced it in the pocket of his jacket. He then walked over to the bunk on which petitioner was lying and spoke to him, saying "Let's have it called off, let's shake the thing off." Petitioner was not heard to make any reply to deceased's offer. The deceased then went to a chair at the opposite end of the tent and sat down. Petitioner arose and walked out of the rear door of the tent. He re-entered the tent through the front door several minutes later, armed with a .45 caliber automatic pistol. He pointed the pistol at the deceased, and ordered him to remove his hands from his jacket pocket. Petitioner testified that after he observed the deceased move his arm, he interpreted it as a movement to get the gun out and fired one shot. The deceased stood up and took several steps. Petitioner then fired two or three times and the deceased collapsed. At the time the deceased collapsed, first aid was rendered and thereafter an ambulance was called. Upon the arrival of the ambulance, the deceased was placed on a stretcher. A P–38 automatic was found on the floor under his body. He was removed to the 181st Evacuation Hospital, and died as a result of the wounds on June 19, 1951.

Petitioner was described as a quiet soldier. The deceased's disposition was variously described by defense witnesses. A friend of petitioner characterized the deceased as "something on the order of a bully" and amplified this statement by saying that the deceased was "ready at all times to start an argument." A company officer described the deceased as "an active sort of person and very antagonistic." Prior to the shooting, when he saw the deceased on the evening of May 29, 1951, he described his disposition as "pretty joyful in spirit." The commanding officer of both petitioner and the deceased stated that he had known the latter for a period of two years, that he was not quarrelsome but "he always had some sort of comment or something to say when you told him to do something." The first sergeant of the unit testified to an incident between petitioner and the deceased that occurred during the prior year when the unit first arrived in Korea. The deceased lay on petitioner's bunk and refused to get up at the latter's request. Petitioner appealed to the first sergeant who ordered the deceased to get up. The deceased complied with the request, and as he was leaving grasped petitioner by the wrist and attempted to pull the latter out of the tent. Petitioner then held on to the supports of the tent door and pulled away. After this incident petitioner and the deceased were friends.

The first error alleged is the failure of the law officer to instruct the court on the law of self-defense. In this respect we note that defense counsel made no request for such an instruction. It is the defense contention that it was the law officer's duty to so instruct even in the absence of a request.

The necessity of instructions by the law officer on affirmative defenses is a novel issue. In deciding this issue, it is appropriate that we should note again our fundamental concepts of policy in relation to instructions. Congress, in the Uniform Code of Military Justice, 50 U.S.C. §§ 551–736, has endeavored, whenever possible, to bring courts-martial procedure into conformity with that obtaining in civilian criminal courts. This is especially true as to the func-

tions and duties of the law officer. See United States v. Berry (No. 69), 1 USCMA 235, 2 CMR 141, decided March 18, 1952. In so far as the law of instructions is concerned, however, we have tempered this principle with a realization of the practical factors inherent in court-martial trials, as well as the newness of the instruction concept to military justice in general, and law officers in particular. United States v. Rhoden, (No. 153), 1 USCMA 193, 2 CMR 99 decided February 26, 1952. We are mindful, also, that our rules in regard to instructions must perforce apply also to special courts-martial, where the president is, more often than not, without legal training.

The statutory basis for the law relating to instructions lies in Article 51(c) of the Uniform Code of ■ Military Justice, 50 U.S.C. § 626, which provides in part as follows:

"Before a vote is taken on the findings, the law officer of a general court-martial and the president of a special court-martial shall, in the presence of the accused and counsel, instruct the court as to the elements of the offense . . . ."

This statutory provision is amplified in Paragraph 73 of the Manual for Courts-Martial, 1951. The obvious intendment of Article 51(c) is to provide the court with the framework of legal issues to which the evidence must be fitted in order to render intelligent findings. "Whatever the degree of guilt, those charged with a Federal crime are entitled to be tried by the standards of guilt which Congress has prescribed." Screws v. United States, 325 U.S. 91, 107, 89 L. ed. 1495, 1505, 65 S. Ct. 1031, 162 A.L.R. 1330. As this Court said in United States v. Clay (No. 49), 1 USCMA 74, 1 CMR 74, decided November 27, 1951: "Moreover, assuming, as contended, that most members of a court-martial have a smattering knowledge of the law and do not need to be informed, Congress could reasonably demand that immediately before deliberating upon a finding those who know have their memory refreshed and those who do not be enlightened."

Applying these standards to the necessity of instructions on certain affirmative defenses, we think it ■ may fairly be said, as a generality, that the court is insufficiently informed as to the "law of the case" without legal explanation of these defenses, where properly raised. We are here concerned with the issue of self-defense under a charge of premeditated murder. Murder is recognized, both at common-law and by most American statutes to be but one division of generic homicide. Wharton, Criminal Law, 12th ed. § 418; United States v. Bartholomew, (No. 166), 1 USCMA 307, 3 CMR 41, decided April 16, 1952; United States v. Clark, (No. 190), 1 USCMA 201, 2 CMR 107, decided February 29, 1952; United States v. Roman, (No. 191), 1 USCMA 244, 2 CMR 150, decided March 19, 1952. We have already recognized the necessity, in a proper case, of instructing on the elements of included offenses where the charge is murder. United States v. Roman, supra. But homicide also includes both excusable and justifiable homicide. Wharton, Criminal Law, 12th ed. § 418; Black's Law Dictionary, 4th ed., page 867. The former is universally defined to include homicide se defendendo—killing in self-defense. Historically, in cases of homicide se defendendo, the crime remained, but the accused was entitled, as a matter of course, to a full pardon. 3 Stephen, History of Criminal Law 76. Today, homicide is a neutral term, and homicide in self-defense is actually not an offense.

We think there is as much necessity, in a proper case, for instructions as to circumstances which will ■ reduce murder to excusable homicide as there is for instructions as to circumstances that will reduce murder to manslaughter or negligent homicide. Murder is one of the most serious offenses known to society. An uninformed court-martial cannot know the technical legal view of the circumstances which will excuse a killing otherwise classified as murder. In order to fulfill their responsibility to both society and the accused, it is essential that, in a proper case, a court-martial be informed as to the law in relation to

456

excusable homicide. A different view would detract substantially from the Congressional requirement that the law officer instruct the court as to the constituent elements of the offense charged and would be inconsistent with our already-enunciated views regarding instructions on lesser included offenses.

It does not follow from what we have said that there must be an instruction on self-defense under every charge of willful and unlawful killing. Where there is no predicate whatsoever in the evidence—either defense or prosecution—for an inference of self-defense, it would be a useless and even confusing gesture to charge the court on this issue. On the other hand, if it clearly appears from the evidence that there is a sound theory of self-defense, an appropriate instruction must be given. We are here confronted with the necessity of establishing a test for cases which, like the one under discussion, fit neither of these extremes. Defense contends that if there is any evidence supporting a claim of self-defense, however weak or doubtful it may be, the issue must be submitted to the court with appropriate instructions, even in the absence of a request by defense counsel. Several Federal cases are cited in support of this proposition. However, one of these—Tatum v. United States, 190 F. 2d 612 (C.A., D.C. Cir.)—appears to adhere to a more strict test than that argued for by defense. Stevenson v. United States, 162 U.S. 313, 40 L. ed. 980, 16 S. Ct. 839, involves a situation where an instruction was offered and refused. It may be arguable that a less severe test should be adopted where defense counsel presents his case in accordance with a certain theory and then requests appropriate instructions on that theory. However, that case is not now before us. Defense counsel here made no request for instructions, nor did he object to the instructions given.

The law officer is required by statute, as already noted, to instruct the court as to the elements of the offense. We have mentioned, supra, the decision in which we have held that this requires instruction on the elements of lesser included offenses fairly raised by the evidence. We are persuaded that, since the duty to instruct on self-defense must spring from the same source as, and is directly related to, the duty to instruct on lesser included offenses, the same test should apply in each instance. There must be some evidence from which a reasonable inference can be drawn that the affirmative defense was in issue. This view is entirely consistent with the test established by most civilian criminal courts. See State v. Greer, 218 N. C. 660, 12 S. E. 2d 238; Mack v. State, 185 Ga. 415, 195 S. E. 179; Noe v. Commonwealth, 290 Ky. 194, 160 S. W. 2d 600; State v. Wright, 352 Mo. 66, 175 S. W. 2d 866; Prater v. State, 142 Tex. C. R. 626, 155 S. W. 2d 934; Soucie v. State, 218 Ind. 215, 31 N. E. 2d 1018.

Applying the test enunciated above to the circumstances of this case, we conclude that there was no obligation for the law officer to instruct on the law of self-defense. The crime of murder being such a serious offense in the eyes of society, courts have been inclined to view with care a claim by the killer that he acted in self-defense. Thus, the right to self-defense generally exists in sudden and violent cases, where delay would put the party in immediate danger of the loss of life or great bodily harm. People v. Fleming, 218 Cal. 300, 23 P. 2d 28; Commonwealth v. Digeso, 254 Pa. 291, 98 Atl. 882; People v. Motuzas, 352 Ill. 340, 185 N. E. 614; see Warren, Homicide, 1938 ed. § 154; Wharton, Criminal Law, 12th ed. § 613. Here, there were some factors pointing toward a fear of violent action. The deceased had provoked a fight with the accused; he had threatened to kill the accused; he appeared armed in the accused's tent; and he had his hand in a pocket where the accused had seen him place a gun. However, the previous difficulty between the two men had preceded the killing by some hours; the deceased evidenced an intent to "make amends" just prior to the shooting; he uttered no threats to the accused while in the latter's tent; and he made no attack.

It is true that the law does not hold every man to a high standard of bravery. Although some courts apply an objective, reasonable man test in assessing danger to the accused, others say that the accused is entitled to act according to his own assessment of the situation. Brown v. United States, 256 U. S. 335, 65 L. ed. 961, 41 S. Ct. 501, 18 A.L.R. 1276; Hood v. State, 70 Okla. Cr. 334, 106 P. 2d 271; People v. Ingrum, 34 Cal. App. 2d 562, 93 P. 2d 1056. However, even the latter group of authorities require that there be a "reasonable ground" for fear of death or great bodily harm. The Manual for Courts-Martial, United States, 1951, paragraph 197 (c), provides as follows:

". . . To excuse a person for a killing on the ground of self-defense, he must have believed on reasonable grounds that killing was necessary to save his life or the lives of those whom he might lawfully protect, or to prevent great bodily harm to himself or them. The danger must be believed on reasonable grounds to be imminent, . . . ."

Here, the accused was not attacked. The evidence of record shows that the deceased may have only desired to make amends. Although it is true that one has the same right to defend against threatened attack, as he has to defend against an actual attack, this record shows no real threats immediately, or for a reasonable time preceding the shooting. Past threats and hostile actions may be looked to only in connection with present demonstrations.

However, regardless of how the situation may have appeared to the accused, the fact remains that he left the tent, procured a weapon, and returned. Thereafter, gun in hand, he ordered the deceased to remove his hands from his pockets and, when the latter did not comply, shot him several times. Indeed, the very act which the accused ordered the deceased to perform—remove his hand from his pocket—was the act which the accused testified at the trial caused him to fear for his life. Having pursued the course outlined above, and regardless of the initial impression made on him, the accused was in no po-

**458**

sition to claim self-defense. See State v. Shepherd, 220 N. C. 377, 17 S. E. 2d 469; People v. Filippelli, 173 N. Y. 509, 66 N. E. 402; State v. Adler, 146 Mo. 18, 47 S. W. 794. There may have been a time and a place where persons were entitled to take the law into their own hands. Today, if the conflict can be avoided, the law must be relied on for redress. It is asking too much to excuse this accused when, after the original encounter, he not only had the opportunity to, but did, leave the presence of the deceased. He could have easily, if he feared for his life, sought help from other military personnel, or even reported the incident to those on duty. He had ample opportunity to do this without, in any way, endangering his personal safety. Having chosen to arm himself and seek a renewal of the encounter, he is in no position to maintain that he shot in self-defense. Self-defense is a defensive, not an offensive act; and it cannot exceed the bounds of mere protection of one's self. We need not here decide the extent of the accused's duty to retreat, since he did in fact do so. See Brown v. United States, supra. Once out of danger, he could not return, threaten, kill, and then claim self-defense.

In appraising the evidence, we have given due consideration to the testimony of the accused that he fired only because the deceased was "trying to get his weapon out." This, however, occurred after the accused had armed himself and returned. Indeed, at this juncture, the deceased may well have had justification for protecting himself against a possible attack by the accused. See Johnson v. Commonwealth, 285 Ky. 374, 147 S. W. 2d 1048. But, under any view of the evidence, we are convinced that no fair issue of self-defense was presented. The law officer was, therefore, justified in not giving an instruction on this issue.

The second issue concerns the failure of the law officer to instruct the court on the elements of voluntary manslaughter, the offense of which the accused was found guilty. It is urged that the decision of this Court in United States

v. Clark, (No. 190), 1 USCMA 201, 2 CMR 107, supra, makes this failure to instruct prejudicial error. We think the Clark case, supra, may be distinguished. It was there noted that the decision as to the scope of instructions must be made by the law officer prior to the findings. He must weigh the evidence and need instruct only on those lesser offenses which the evidence tends to prove. Necessarily implied, if not directly stated, in that opinion was a finding that the evidence required an instruction on negligent homicide—the offense of which the accused was found guilty. Here, we find no necessity, under the evidence, for an instruction on voluntary manslaughter. Ordinarily, that crime contemplates a killing in the heat of passion, with adequate provocation. The evidence outlined in connection with our discussion on self-defense shows that the accused did not kill in a provoked and sudden affray. Considerable time had elapsed since the original provocation. No threats were uttered just prior to the killing—instead, an effort at apology was made. The accused left the scene and returned, armed, to threaten the deceased. These circumstances are inconsistent with a loss of will and malice brought on by sudden and adequate provocation. Even defense counsel concedes that "there is not one scintilla of evidence in the record to show that the killing occurred 'in the heat of passion.'" Accordingly, petitioner was not prejudiced by the failure to instruct on voluntary manslaughter.

Finally, it is urged that the evidence will not support a finding of voluntary manslaughter, and that the finding, under a charge of murder, cannot therefore stand. This contention was adequately dealt with in our opinion in United States v. Bartholomew, supra. Here, as there, petitioner was found guilty of a lesser offense where the evidence, in our opinion, clearly supports a greater. Petitioner is in no position to complain.

This disposes of the errors raised. We have examined the record carefully, and find no other errors requiring discussion. The decision of the board of review is, therefore, affirmed.

Judges LATIMER and BROSMAN concur.