UNITED STATES, Appellee,

v

CHARLES BLACK, Corporal, U. S. Marine Corps, Appellant

12 USCMA 571, 31 CMR 157

No. 15,193

December 15, 1961

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel M. G. Truesdale,* USMC.

*Lieutenant John W. Boult,* USNR, argued the cause for Appellee, United States.

FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of unpremeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, and sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for ten years, and reduction to the grade of private. The convening authority approved the sentence. A Navy board of review, in order to correct an instructional error, affirmed findings of guilty of voluntary manslaughter, in violation of Code, supra, Article 119, 10 USC § 919, and reduced that portion of the sentence adjudging confinement to eight years. We granted accused's petition for review on several issues, only one of which need be resolved.

## I

The evidence presented in this record discloses that the accused and his victim, Lance Corporal Johnny R. Harris, were friends, members of the same Marine unit, and billeted in the same barracks cubicle at Little Creek, Norfolk, Virginia. During the early morning hours of August 8, 1960, an argument developed between Black and Harris concerning whether Harris was a native of Georgia or Ohio. When Black stated that he had checked Harris' service record, the latter became angry and profanely demanded to know whether Black "want[ed] to go to blows." When he repeated this inquiry, Black turned away and started toward his wall locker. Harris followed, urged that Black fight him, and punctuated his statements by pushing Black toward the locker. These shoves were repeated three or four times. Harris had a reputation for being "very good" with his fists and being able to "take care of himself."

When the parties reached Black's locker, Harris continued his threatening behavior. Black seized a bayonet and turned, stabbing Harris in the abdomen and cutting him on the arm. Harris retreated, and Black, throwing the bayonet on his bed, followed him out of the cubicle into the passageway. There, he struck Harris several times with his fists, and the latter either fell or was knocked to the floor. Black then knelt beside Harris' recumbent form, arose, and returned to the cubicle. He replaced his bayonet in his locker, obtained his shaving gear, and went into the head to shave. Others observed that Harris was wounded and secured medical aid for him. He died in a local naval hospital on the same day from the effects of the abdominal stab wound.

When Black returned from the head, he stated to another Marine that he was not aware that he had cut Harris. In addition, his pretrial statement reflects the following version of the incident:

". . . Harris then said I have always been wanting to fight you, then he kept saying do you want to fight. Then he stood up & came toward me, I then turned away looking for my shaving gear in my locker. Then I told him I did'nt [sic] want to fight him. At this time Harris was dressed in utility trousars [sic] & T-shirt and I was dressed the same way. I was leaning down in front of my open locker getting my shaving gear when Harris took hold of my left sholder [sic] & turned me around again saying he want to fight. As I turned around I put my shaving gear on my rack and stood facing Harris. I told him again I did'nt [sic] want to fight him. I turned back to my locker. He then turned me around again by taking hold of my left sholder [sic] & kept saying 'Do you want to fight.[?]' Harris walked up to me so that his face was about 2 inches from mind [sic] & our toes were about touching. I then reched [sic] down with my right hand to the towel rack on my locker door & picked up my bayonet whish [sic] was hanging there. The bayonet was in the sabbard [sic]. I stood facing Harris & again told him to go ahead that I did'nt [sic] want to fight. Then he came toward me & I steped [sic] back &

**573**

pulled the bayonet from it's [sic] scabbard & droped [sic] the scabbard on the floor. I swung at Harris with the bayonet whish [sic] was in my right hand. I swung from my right to my left & then from my left upwards towards my right. Harris backed away & I tossed the bayonet on my bunk & hit Harris twise [sic] with my left fist knocking him down. At this time I did not know if I had cut Harris or not. I went back to my rack picked up the bayonet putting it in the scabbard & put it back in my locker. I then picked up my shaving gear & went to the head.

. . . . .

"I was afraid of Harris & I thought that when he saw me with a bayonet it would scare him away. When I swang [sic] I did not mean to cut him. Harris did not have any weapon on his person that I knew of at the time of our fight."

In addition to the foregoing, considerable evidence was received tending to establish accused's good character and reputation for peaceable conduct.

Upon conclusion of the evidence, defense counsel requested, among other things, instructions on the elements of the lesser included offense of voluntary manslaughter and the doctrine of self-defense. These instructions were denied, and the law officer limited his advice to the court-martial to the elements of unpremeditated murder, a discussion of the intent involved, certain definitions, the effect of evidence of accused's good character, and the required concluding charge.

## II

The principal issue before us serves to dispose of the case. Accordingly, we limit our review to the question whether the law officer, as requested by the defense counsel, should have instructed the court members on the doctrine of self-defense. We think it clear that the posture of the evidence required him to do so.

In military law, as in other jurisdictions, the taking of human life is excusable if done in defense of one's person. United States v Ginn, 1 USCMA 453, 4 CMR 45. The doctrine, however, is limited to use of defensive force and may not be made the basis for an unwarrantedly offensive act. Warren on Homicide, Perm ed, sec. 148; United States v Amdahl, 3 USCMA 199, 11 CMR 199. Thus, in United States v Ginn, supra, we held that self-defense was not in issue when it appeared that the accused rebuffed his eventual victim's attempts peaceably to settle their quarrel, left the room, armed himself, and returned to shoot it out. The test which we there used to determine whether an instruction on self-defense need be given was simply whether there is in the record "some evidence from which a reasonable inference can be drawn that the affirmative defense was in issue." United States v Ginn, supra, at page 457.

The theory upon which the foregoing standard is posited was succinctly set forth in United States v Simmons, 1 USCMA, 691, 5 CMR 119, at page 695:

". . . From a factual standpoint, the duty of the law officer to instruct on an issue is not founded on whether be believes the story told by witnesses for the Government or by the accused, *it is based on the necessity of giving the members of the court-martial a clear picture of what is in issue so that they can accept either version of the evidence and test it by the instructions given."* [Emphasis supplied.]

When we have concluded that no instructions were required on the doctrine of self-defense, we have made it clear that there was no evidence in the record which would form the basis for a reasonable inference that the accused acted in order to save himself from death or serious bodily harm. United States v Troglin, 3 USCMA 385, 12 CMR 141. When the contrary situation was presented, we have not hesitated to reverse. United States v Weems, 3 USCMA 469, 13 CMR 25. Necessarily, each case turns to a large degree upon the evidence presented, for

574

instructions are designed to convey the legal effect of the proof to the members of the court-martial. United States v Simmons, supra; United States v Acfalle, 12 USCMA 465, 31 CMR 51.

Turning to the record before us, we find evidence that the accused was deliberately assaulted by his eventual victim, who also aggressively stated his determination to engage in combat. Having shoved Corporal Black to his wall locker, Harris did not desist although accused repeatedly informed him that he did not desire to fight. Accused states that he was afraid of Harris, whose reputation as a fighter was commonly known. He denied any intent to stab his victim and declared that he seized the bayonet only to frighten his assailant away. His version of the incident gains support from the fact that he flung the weapon aside and resorted to the use of his fists as well as from his denial that he knew Harris was cut until he returned from shaving.

We do not mean to intimate in the slightest degree that the foregoing constitutes the only possible construction of the evidence or, indeed, the more probable version of this unfortunate series of events. We are nevertheless certain that it offers "some evidence from which a reasonable inference can be drawn that the affirmative defense [of self-defense] was in issue." That is all that is required to impose an instructional duty upon the law officer. United States v Ginn, supra; United States v Simmons, supra.

The Government argues, however, that the facts clearly show that it was unreasonable for the accused to fear either death or grievous bodily harm at Harris' hands and that his resort to use of a dangerous weapon constituted employment of such a brutally excessive force that he was thereby deprived of the right to claim that he acted in self-defense. With regard to the first proposition, reliance is placed on United States v Maxie, 9 USCMA 156, 25 CMR 418. That case does not so hold, for we were there concerned solely with the question whether an accused's honest but unreasonable belief that the infliction of death or grievous bodily harm was necessary to protect his own life or bodily integrity, i.e., "imperfect self-defense" was sufficient to reduce the crime of murder to that of voluntary manslaughter. In holding that the degree of homicide was not so changed, we specifically adverted to the fact that the law officer had instructed the court members regarding the law of self-defense.

Concerning its second contention, it is apparent the Government urges upon us the proposition that resort to a deadly weapon may never be had in face of a fistic assault. See United States v Straub, 12 USCMA 156, 30 CMR 156. There is no such unqualified rule, for whether an accused, by resort to a weapon, uses excessive force in repelling an assault upon him is dependent upon all of the circumstances and is essentially an issue of fact to be determined by the jury. Lujan v United States, 209 F2d 190 (CA 10th Cir) (1953); Davis v State, 152 Ind 34, 51 NE 928 (1898). As was remarked in the latter case, the adoption of an absolute prohibition against the use of a deadly weapon to repel an unarmed assault would mean that "the assaulted party must stand and take his chances of being knocked down and stamped into a jelly, or of being choked to death, before he can lawfully use a weapon in his defense." We agree that such is not the law. Little men, as well as those physically more fortunate, are entitled to take reasonable measures in order to protect themselves.

Essentially, what the Government would have us do here is to apply the law regarding self-defense to the evidence before us and resolve all factual issues in the case against the accused, as if we were measuring sufficiency of the evidence. This we decline to do. An issue existed regarding whether the accused slew Harris in defense of his own person, and it should have been submitted to the fact finders. That was the theory of accused's case, and there is some evidence in the record to sup-

port it. He was, therefore, entitled to its consideration by the court members. United States v Simmons, supra; United States v Ginn, supra. As we cannot usurp their function at this level, reversal is required.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the accused's pretrial statement and the other evidence do not raise an issue of self-defense. In his own statement the accused said he intended only to "scare . . . [Harris] away" when he swung the bayonet, and he did not even "know if . . . [he] had cut Harris or not." He was so patently unafraid of the victim that he admits he threw the weapon away after two quick swings, and proceeded to strike the victim "twise [sic] with . . . [his] left fist knocking him down." Manifestly, the accused did not use the bayonet because he feared that serious bodily injury would otherwise be inflicted upon him. See United States v Maxie, 9 USCMA 156, 25 CMR 418. I would affirm the ruling of the law officer and the decision of the board of review.