**UNITED STATES, Appellee,**

v.

**Private (E–2) Bruce A. CLAYBORNE,
SSN 179–46–4419, United States
Army, Appellant.**

**CM 437223.**

U. S. Army Court of Military Review.

29 March 1979.

Captain John M. Zoscak, Jr., JAGC, argued the cause for the appellant. With him

on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, and Captain Larry D. Anderson, JAGC.

Captain Landon P. Snell, JAGC, argued the cause for the appellee. With him on the brief were Colonel Thomas H. Davis, JAGC, and Major David McNeill, Jr., JAGC.

Before FULTON, TALIAFERRO and WATKINS, Appellate Military Judges.

## OPINION OF THE COURT

FULTON, Senior Judge:

The appellant stands convicted of the unpremeditated murder, by stabbing, of Private Jack T. Outlaw. He has been sentenced to 20 years' confinement at hard labor and a dishonorable discharge, together with reduction in grade and forfeitures of pay. Of the nine issues raised on appeal, we concern ourselves first with the appellant's contention that he acted in self-defense and that the Government failed to negate that defense beyond a reasonable doubt. This is an issue of the gravest importance, not only for the appellant, but for the military appellate review system. The issue was fully litigated at the trial. The trial judge's rulings on the admissibility of evidence and related matters were eminently correct. Arguments of counsel fairly depicted the evidence. The judge correctly instructed the court members—six experienced commissioned and noncommissioned officers—about the self-defense issue.

▌ Although the court members found the killing of Private Outlaw was not justified, Article 66 of the Uniform Code of Military Justice, 10 U.S.C. § 866 (1976), commands us to affirm only such findings of guilty as we find correct in fact as well as in law. Although recognizing that the trial court saw and heard the witnesses, we may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact.[1] We have done that. We reverse the conviction.

▌ When the fatal event occurred, the appellant was a relatively new member of his artillery battery in Germany; he had been in the unit only 12 days. So far as the record shows, he had had no previous direct contact with the victim, Private Outlaw, for the trial evidence related solely to the fatal night, Friday, 9 December 1977, and early morning hours of Saturday, 10 December 1977: Outlaw had been in a barracks room drinking and conversing with some of the noncommissioned officers. The appellant visited an Enlisted Club and then returned to the barracks, where, at about 0100 hours (Saturday) he was playing pool in the game room with one of his roommates. Suddenly, the appellant and Outlaw were engaged in a loud argument followed by a struggle in the hall outside the game room. No one else saw the beginning, but the appellant's version indicates that Outlaw deliberately picked a fight. An abundance of evidence indicates that such was Outlaw's custom, especially when he had been drinking.

During the struggle, Outlaw was hit above the left eye with a pool stick that the appellant was holding, although in what manner he was struck and whether or not intentionally was not shown. Several soldiers broke up the fight. Some of them took the appellant to a room (not his own) in the barracks. Meanwhile, it required three persons (two noncommissioned officers and one other soldier) to restrain Outlaw, who was struggling violently, shouting obscenities, and threatening to kill the appellant.

The staff duty officer (one of the battery officers) arrived to find Outlaw still struggling with his restrainors. He separated them (it was necessary to pry one's shirt from Outlaw's hand) and took Outlaw to his own room. There, they talked for what seemed to him 20 minutes, and Outlaw appeared to calm down. When the duty officer left, Outlaw, although told to stay in his room, acted upon another suggestion of the duty officer and went and apologized to the noncommissioned officers for "giving [them] such a hassle in the hallway." The

---

1. *United States v. Sikorski*, 21 U.S.C.M.A. 345, 348, 45 C.M.R. 119, 122 (1972).

deputy officer specifically ordered Outlaw not to go to the appellant's room. Had Outlaw obeyed that order, there might be nothing further to be related here.

The appellant was by now in his own room. Upon leaving Outlaw, the duty officer went there, talked to him briefly, then went to the orderly room. Meanwhile, the appellant, conscious of Outlaw's threat to kill him, had been told about his erstwhile antagonist. He learned that Outlaw was an experienced boxer; that he would fight anyone any time, with or without evident provocation (appellant already had discovered this himself); and that he had successfully fought as many as three men on the street at a time. More importantly, he learned that once, after a fight with Private First Class Palmer, Outlaw had gone to the room where Palmer was sleeping and had choked and beaten him.[2] Indeed, while other soldiers were trying to assure the appellant that all would be well and nothing further would occur (an assurance sometimes disquieting merely because of the felt need for its iteration), a friend of Outlaw's was telling the appellant "that Outlaw wouldn't forget it, that he's be back over to his room that night if he got a chance because he's done it before."

Substantially every member of the unit who testified was of the opinion that Outlaw could throw a man through a window or put a man (indeed several men) in the hospital with a blow from his fist. There was no specific testimony that these opinions were conveyed in terms to the appellant, yet, in the events and conversations of the evening, he could not have escaped gaining the same impression, and he was a much smaller man.

Accordingly, when the appellant shortly thereafter left his room to get a soft drink, encountered Outlaw at the soda machine, and was again threatened, he returned to his room in a clearly frightened state. He recently had bought a German hunting knife[3] from an on-post vendor; taking the knife from his locker near the door, he put it in the drawer of a desk that sat between two windows, along the exterior wall opposite the entrance to the room.

In due course, at about 0230 hours, Private Outlaw entered the room. The appellant was sitting on the desk, conversing with Specialist Four Compton, who was sitting on an elongated coffee table. (Compton had come in from a neighboring room to obtain a cigarette from one of the occupants, Johnson, who then had left, evidently to search for cigarettes and did not return.) Outlaw first professed that he only wanted to talk to appellant, but then turned back to the door and locked it from the inside. He advanced towards appellant, said "I'm going to kill you," and asked which of the two (third floor) windows he wanted to go out. The visiting Compton's contribution to peace consisted of saying, "Ain't no use of you all fighting or nothing like this." The appellant, still seated on the desk, pushed Outlaw away with his bare foot. Outlaw grabbed the foot and pulled appellant part way off the desk, then came at him with fists clenched.[4] As the six-foot, one hundred-eighty pound Outlaw swung at the appellant, six inches shorter and fifty pounds lighter, the latter grabbed his knife, ducked and swung twice at Outlaw, saying, "I'll kill you boy, just leave me alone." Outlaw sustained two stab wounds, one of which reached his heart. He collapsed on a bed, mortally wounded.

As a crowd quickly gathered, appellant remained there shocked. The staff duty officer came, cleared the room, and told appellant to put down his knife and go to the orderly room. The appellant did so.

---

**2.** We do not know whether the appellant knew that his was the same room in which the sleeping Palmer had been attacked by Outlaw.

**3.** At least one court member thought it was more a throwing knife than a typical hunting knife. Perhaps it was, but the appellant seems to have thought it was a hunting knife.

**4.** Specialist Four Saunders, one of the other occupants of the room unlocked the door and entered just as Outlaw made his final, fatal advance. He was not, however, there in time to have stopped the fight.

Later, he was taken to the military police station. There, informed that Outlaw was dead, he made a complete account—truthful, we believe—of the night's tragic events.

On the one hand, we do not wish to condone the appellant's resort to a knife.[5] Yet, on the other hand, we are aware that the use of a concealable weapon does not as a matter of law negate the defense of self-defense.[6] There was no further retreat for the appellant. His back literally was to the wall in his own room (with a bystander, but no fellow occupant, present.[7] Resort to the chain of command was impractical at that point. The staff duty officer had come and gone. The battery noncommissioned officers, so far as this record discloses, utterly failed any obligation to enforce orderliness in the barracks or even to ascertain what was going on. Some were drinking with Private Outlaw in their rooms earlier in the evening. Even the restraint they imposed on him after the first encounter seems to have been as much for the purpose of keeping him out of trouble ("He does have a problem in this area," one said) as to protect the other soldier involved (appellant). In fact, they may have been afraid of Outlaw (one testified that, "Even as an NCO, if you messed with him he'd punch your lights out").

We are not convinced beyond a reasonable doubt that the appellant did not act in self-defense or that he used excessive force.[8]

The findings of guilty and the sentence are set aside. The charges are dismissed.

Judge TALIAFERRO and Judge WATKINS concur.

**UNITED STATES, Appellee,**

---

5. His possession of a knife of its size in the barracks may have violated command regulations. At least one court member, as disclosed by his questions, thought so. Although there was no proof on that point, the appellant may have gained the same impression, for, when the subject arose, he testified that he had not yet attended any orientation since his arrival in the unit and was unaware of any requirement that large knives be kept in the unit arms room.

6. *See United States v. Armistead,* 16 U.S.C.M.A. 217, 36 C.M.R. 373 (1966); *United States v. Henderson,* 49 C.M.R. 74 (A.C.M.R.1974). *Cf. United States v. Hayden,* 13 U.S.C.M.A. 497, 33 C.M.R. 29 (1963). *See also United States v. Hurt,* 19 U.S.C.M.A. 206, 209, 41 C.M.R. 206, 209 (1970) (inflicting multiple wounds).

7. The opportunity to retreat or seek help is one factor to be considered in relation to the appellant's use of deadly force in self-defense. *United States v. Smith,* 13 U.S.C.M.A. 471, 479, 33 C.M.R. 3, 11 (1963). As to retreat in assigned military quarters, *see United States v. Yabut,* 20 U.S.C.M.A. 393, 43 C.M.R. 233 (1971) (2–1 opinion).

8. As for the burden of proof, *see, e.g., United States v. Lombardi,* 14 U.S.C.M.A. 466, 34 C.M.R. 246 (1964). Cases on self-defense are collected and discussed in *United States v. Jackson,* 15 U.S.C.M.A. 603, 36 C.M.R. 101 (1966); *United States v. Smith,* 13 U.S.C.M.A. 471, 33 C.M.R. 3 (1963). For a factual comparison and reaching an opposite result, *see United States v. Ratliff,* 49 C.M.R. 775 (ACMR 1975).