**UNITED STATES, Appellee**

v.

**Eric MARTINEZ, Seaman Apprentice
U.S. Navy, Appellant.**

No. 93–1128.
CMR No. 92 0044.

U.S. Court of Military Appeals.

Argued March 3, 1994.

Decided Sept. 20, 1994.

For Appellant: *Lieutenant Gerard W. Wittstadt, Jr.,* JAGC, USNR (argued).

For Appellee: *Lieutenant Commander David B. Auclair,* JAGC, USN (argued); *Colonel T.G. Hess,* USMC, *Commander Stephen A. Stallings,* JAGC, USN, *Lieutenant Commander Lyle H. Bowen, Jr.,* JAGC, USN (on brief); *Lieutenant Ralph G. Stiehm,* JAGC, USNR.

GIERKE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of unpremeditated murder and aggravated assault, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 USC §§ 918 and 928, respectively. The approved sentence provides for a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Military Review affirmed the findings and sentence in an unpublished opinion.

We granted review of the following issues * :

I

WHETHER AN ACCUSED MAY USE DEADLY FORCE TO REPEL A GROUP OF RACIALLY MOTIVATED ATTACKERS WHO REPEATEDLY PUNCH, KICK, AND OTHERWISE PREVENT THE ACCUSED FROM SUCCESSFULLY RETREATING WHEN THE ATTACKERS ARE THEMSELVES UNARMED.

II

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW APPLIED THE INCORRECT LEGAL STANDARD WHEN IT DETERMINED THAT APPELLANT HAD BEEN PROPERLY CONVICTED OF UNPREMEDITATED MURDER.

We hold that, under the circumstances of this case, appellant may have been entitled to use deadly force to defend himself, but the issue was not correctly framed for the triers of fact in the military judge's instructions. We conclude that the military judge's failure to correctly instruct the triers of fact on the issue of self-defense was plain error, and we reverse.

---

* We also granted review of the issue resolved in favor of the Government in *United States v.*

Appellant's conviction of unpremeditated murder and of aggravated assault was based on his involvement in a brawl on the night of July 20, 1990. During this brawl, Electrician's Mate Third Class Michael J. Dapper was fatally stabbed in the back, and Damage Control Technician Third Class Richard F. Loucks was cut on both forearms and in his right armpit.

Shannon Mikeska, who was on active duty as a Navy petty officer on the night of the incident, testified that he and several other petty officers were at a birthday party for most of the day and had been drinking steadily. Mikeska is a self-described bodybuilder, 5 feet 11 inches tall and weighing 220 pounds. At about 9:00 p.m., Mikeska heard a commotion outside the apartment house where the party took place. He observed Petty Officers Chapa, Loucks, and Dapper arguing. Chapa is Hispanic and dark complected. The others are Caucasian. Loucks and Chapa "wanted to leave the party" but Dapper did not "want them to leave because they were too drunk" to drive. Dapper told Chapa, "Listen, I just got a DUI, I know what it's like." Chapa responded by telling Dapper that "he was stupid enough to get a DUI." At that point Mikeska had joined the group. Apparently offended when Chapa told Dapper that he was stupid, Mikeska punched Chapa, who fell against his truck. Petty Officer Ben Black grabbed and restrained Mikeska. Mikeska testified that at this time five persons (Mikeska, Loucks, Black, Dapper, and Chapa) were present.

Meanwhile, appellant drove past the scene of the altercation with a civilian friend, Carl Stanifer. Appellant is Hispanic; Stanifer is black. Appellant is 5 feet 5 inches tall and describes himself as "a small guy." Stanifer was described by witnesses as a tall black male.

Stanifer testified that he saw a "violent fight," involving "about twelve" participants. Stanifer told appellant to stop the car, but appellant refused to stop. Stanifer said,

*Mitchell,* 39 MJ 131 (CMA), *cert. denied,* ___ U.S. ___, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994).

"C'mon, man, they're jumping a brother." Appellant finally stopped the car and let Stanifer out, then made a U-turn, parked his car, and remained inside.

Stanifer testified that he approached a white male and asked, "Why you all jumping a brother like that?" The white male responded, "We have you now, nigger." Stanifer testified that a large group, about 12 men, advanced toward him. A "chubby guy," apparently Mikeska, punched at him but missed. Stanifer testified that he punched back and then, "all of them started punching me, kicking me, hitting me in the nose, eye, ear, back. I was scared. I thought I was going to die up there that night. I was hollering, 'Somebody help, somebody help me.'"

Stanifer testified that after he cried out for help, appellant came out of his car, approached the group, and announced, "Step off me, step off me, I have a knife." Stanifer testified that he did not see a knife at that time. The fighting continued, but he was able to make his way back to the car, where one of his assailants jumped on his back. Stanifer was able to shake him off and get into the passenger side of the car. Two people continued to attack Stanifer through the open car door.

When Stanifer got inside the car, the "chubby guy" was trying to start the car but did not have the keys. Stanifer heard appellant tell the "chubby guy" to get out. Stanifer next saw appellant on the passenger side of the car. Appellant was "still struggling and fighting." Someone shouted, "Police." At that point appellant entered the passenger side; Stanifer moved over to the driver's seat; appellant gave him the keys; and they drove away. The crowd continued to punch at Stanifer and kick the car as they drove away.

Stanifer testified that, when appellant handed him the knife after they returned to Stanifer's home, there was no blood on the knife. Stanifer buried the knife in his back yard.

Appellant testified that, when he heard Stanifer call for help, he took a knife which he kept under the driver's seat and put it in his back pocket. He saw "six or more" people surrounding Stanifer. Appellant told the crowd to "chill out." "About four" men advanced on appellant. He took out his knife and warned them not to come near him. The crowd continued to advance, and appellant ran toward the car. As he ran, someone grabbed his shirt from behind, ripping it. Appellant testified that he was pulled to the ground "and that's when they started kicking me, stomping me, dragging me on the floor." Appellant said he was surrounded by "at least five" people. He got up and ran, "just swinging my hand back, trying to get them off me," with the knife in his hand. Appellant testified that as he was running and swinging the knife, he "just felt it cut somebody."

Appellant testified that the "big stocky guy," identified by appellant as Mikeska, was in the driver's seat of his car. Mikeska got out of the car and chased appellant. Appellant testified that he "ended up . . . in front of the car on the passenger side and, like, everybody just calmed down." Appellant got in the passenger door; Stanifer slid over to the driver's side; and appellant gave Stanifer the keys. As Stanifer was trying to start the car, someone began punching at appellant through the open passenger window. Appellant testified that he leaned away from the window but did not punch at the person and did not "recall cutting or stabbing" anyone at that point. While the assailant was still leaning through the passenger window, Stanifer started the car and "just took off."

Mikeska admitted that he had entered appellant's car and was sitting in the driver's seat, looking for the keys, when appellant confronted him. Mikeska testified that appellant punched him in the mouth through the open window. Mikeska responded by slamming the car door into appellant's knees and knocking him down. Mikeska then jumped out of the car; heard Thomas shouting, "Dapper's hurt"; heard "sirens and everything"; and ran across the street.

Radioman Third Class (RM3) Scott Carlstrom testified that he saw a Mexican or Hispanic man run around the car to the passenger side and get into the back seat of

the car. He saw a black male get into the front seat. Dapper and Loucks were "mostly outside" the vehicle, but fighting with someone inside. There were "a lot of punches and stuff," and then the man in the back seat appeared to "lean out." As the car drove away, Carlstrom noticed that Dapper had been stabbed and was bleeding. Carlstrom did not see how either Dapper or Loucks was cut. He testified that he "didn't see no knives."

Machinist's Mate Third Class (MM3) Kenneth Thomas testified that he saw Loucks fighting with a "Mexican male or Hispanic." He saw Mikeska getting into the passenger side of the car, and he saw "a black male come up behind Dapper and, like hit him on the back." Thomas never saw appellant hit Dapper.

Charles and Alice Spelts were two bystanders who observed the fray. They saw "a crowd of people ... probably 15, maybe more," crowded around a small gray vehicle with two occupants, one black and one Hispanic. They observed a "stocky individual," apparently Mikeska, pull the Hispanic out of the car. The Hispanic was surrounded by four or five individuals and was "swinging his arm wildly" and "trying to get away from the individuals that were encircling him and they kept pursuing him." Mr. Spelts testified that he did not see any knives or other weapons during the altercation. Mr. Spelts testified that the Hispanic person "was pulled out of his car twice, ... possibly a third time." He testified that the white males appeared to be the aggressors. He testified that "repeatedly, the black males tried to get away, they ran from them repeatedly and they just stayed on top of them. They would just not let them go."

Mrs. Spelts testified, "The two people that belonged in the car kept going back to the car and, then they would gang up on them and they would pull them out of the car, and they would proceed to fight again." She testified that "the two people who belonged in the car originally had gotten back in the car, and the one—the one guy had come around to the passenger side of the car and, from the waist up, his body was in the car.

As he came back out of the car and proceeded across the road, we noticed at that point, that he was hobbling."

Another bystander, Mr. David Smith, testified that "the driver of the car got out and went to one of the white guys and they continued to talk for about 5 minutes. Then they jumped on him." By the time the other occupant of the car got out, the four white men "had him, the driver, on the ground kicking him." He observed the driver "dragged out" of his car three times. He heard the occupants of the car tell their white assailants, "Leave us alone, all we want to do is leave, leave us alone." He observed one of the assailants jump into the car in pursuit of the passenger. Two others pulled him out of the car, and one screamed, "He's got a knife." After the individual was pulled from the car, "[h]e was holding his side" and "appear[ed] to be in pain". Mr. Smith did not observe any knives or other weapons.

Petty Officer Loucks was cut on both forearms and on his right armpit. He testified that he did not remember fighting and did not know how he was cut. He was drunk and remembered only that he saw Mikeska fighting "a tall black guy" and remembered seeing appellant "standing right in front of me." The prosecution theory was that appellant inflicted the wounds on Petty Officer Louck's forearms and right armpit as he was swinging the knife behind him and running away.

Dapper died from a four-inch deep stab wound which cut the left pulmonary artery. The wound was "lateral to the spine." Appellant's knife was identified by a civilian medical examiner as "consistent with the wound that was produced." The prosecution theory was that Dapper was stabbed in the back while he was leaning through the passenger door window and throwing punches at the passenger-side occupant.

### The Military Judge's Instructions

The military judge instructed the court members on the law of self-defense. His instructions included the following:

The prosecution's burden of proof to establish the guilt of the accused not only applies to the elements of the offenses and to

the lesser-included offense, but also to the issue of self-defense. In order to find the accused guilty you must be convinced beyond reasonable doubt that the accused did not act in self-defense.

You are further advised that there is evidence in this case that the accused brandished a knife solely to defend himself by deterring rather than for the purpose of actually injuring.

A person may, acting in self-defense, in order to frighten or discourage an assailant, threaten more force than he is legally allowed to actually use under the circumstances.

An accused who reasonably fears an immediate attack is allowed to display or threaten the use of an ordinarily dangerous weapon even though the accused does not have a reasonable fear of serious harm, as long as he does not actually use the weapon in a manner likely to produce grievous bodily harm.

Whether the accused was using the knife as a deterrent, or was using it in a manner likely to cause death or grievous bodily harm, is for you to decide. Your determination rests on two factors. First, the accused must have reasonably and honestly believed that EM3 Dapper or DC3 Loucks was about to inflict some bodily harm on himself. The test here is whether, under the same facts and circumstances, a reasonable prudent adult male faced with the same situation, would have believed that there were grounds to anticipate immediate physical harm. *Second, the accused must have intended to use, and must in fact have used, the knife only as a deterrent and not in a manner likely to produce death or grievous bodily harm. If you are satisfied beyond a reasonable doubt that the accused brandished the knife in a manner likely to produce death or grievous bodily harm, rather than merely threatening its use to deter EM3 Dapper [or] DC3 Loucks, the defense of self-defense does not exist.*

(Emphasis added.)

### The Law of Self–Defense

Appellant's case was based on self-defense. Before this Court the Government "con-cede[d] that there may be a right to use a dangerous weapon in self-defense under the theory presented by the appellant to the members at trial." Answer at 6. The Government argues, however, that the members rejected appellant's assertion of self-defense and that their findings are supported by the evidence of record. *Id.*

The law of self-defense is set out in the Manual for Courts–Martial, United States, 1984, which provides in pertinent part as follows:

It is a defense to a homicide, assault involving deadly force, or battery involving deadly force that the accused:

(A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and

(B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

RCM 916(e)(1)(Change 3). *See United States v. Jackson*, 15 USCMA 603, 36 CMR 101 (1966). The test for the first element (reasonable apprehension of death or grievous bodily harm) is objective, viewed through the eyes of a reasonable, prudent person. The test for the second element (honest belief that deadly force is necessary) is subjective, viewed through the eyes of the accused. RCM 916(e)(1), Discussion.

 The theory of self-defense is protection. Thus, "[g]enerally speaking, a person is not entitled to use a dangerous weapon in self-defense where the attacking party is unarmed and commits a battery by means of his fist." *United States v. Straub*, 12 USCMA 156, 160, 30 CMR 156, 160 (1961). Nevertheless, fists and shod feet used by multiple assailants can constitute a means likely to produce death or grievous bodily harm and entitle the person being attacked to use deadly force. *See United States v. Vigil*, 3 USCMA 474, 13 CMR 30 (1953) (fists constituted means likely to produce grievous bodily

harm); *United States v. Thompson,* 27 CMR 662, 667 (ABR) (fists and shod feet used by multiple assailants were means likely to produce grievous bodily harm), *aff'd,* 11 USCMA 5, 28 CMR 229 (1959). *Cf. United States v. Cardwell,* 15 MJ 124 (CMA 1983) (use of beer bottle may be permissible against attempt by unarmed assailant to strangle accused). Thus, the testimony of appellant and his friend, Carl Stanifer, that they were punched, kicked, and dragged by multiple assailants, one of whom was a 220–pound bodybuilder, if believed, would justify the use of a dangerous weapon in self-defense.

■ The military judge has an obligation to instruct on any "special defense," including self-defense, when it is raised by the evidence. RCM 920(e)(3). The military judge has a duty to tailor his instructions to fit the facts of the case. RCM 920(a), Discussion; *United States v. Groce,* 3 MJ 369, 371 (CMA 1977).

### Conclusions

■ The problem in this case is that the military judge's instructions were not tailored to the facts. While the instructions might have been adequate in a case involving a single, unarmed assailant, they did not permit the triers of fact in this case to decide whether appellant was entitled to use deadly force in self-defense because he reasonably feared grievous bodily harm at the hands of a drunken, violent gang and honestly believed that the degree of force used was necessary. The military judge's instructions limited appellant to brandishing his knife but did not permit him to use it in a manner likely to inflict grievous bodily harm even if he reasonably feared grievous bodily harm and honestly believed that it was necessary for him to use his knife to defend himself. Thus, the court members were not given a correct legal framework for evaluating appellant's claim of self-defense. By eviscerating appellant's case based on self-defense, the military judge committed plain error. *See United States v. Curry,* 38 MJ 77, 79 (CMA 1993) (erroneous instruction precluding defense of

accident is plain error); *United States v. Eckhoff,* 27 MJ 142 (CMA 1988) (erroneous instruction foreclosing entrapment defense is plain error).

With respect to the aggravated assault on Loucks, the Government argued, and the evidence would support appellant's claim, that he slashed at Loucks while running away after having been knocked to the ground, punched, and kicked by multiple assailants. With respect to the killing of Dapper, no one could pinpoint when the fatal stab wound was inflicted. Nevertheless, the justification for stabbing him was never evaluated by the triers of fact under correct instructions. While the evidence, construed in the light most favorable to the prosecution, would support a conclusion that Dapper was stabbed in retribution, it would also support a conclusion that Dapper was stabbed during the melee while appellant was wildly thrashing around and attempting to get away from his attackers. Additionally, it would also support a conclusion that Dapper was stabbed while he and several others were continuing to attack appellant and Stanifer inside the car. Since appellant had already been dragged from his car two or three times during the brawl, retreating to the car did not necessarily ensure his safe escape. Suffice it to say, we believe that appellant was entitled to have his claim of self-defense considered under proper legal instructions. Since his claim of self-defense was not submitted to the triers of fact under proper instructions, we must reverse.

In light of our holding with respect to Issue I, we need not decide Issue II.

### Decision

The decision of the United States Navy–Marine Corps Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and WISS concur.