UNITED STATES, Appellee,

v.

Specialist Billy W. BRANSFORD, 415–06–2176 United States Army, Appellant.

ARMY 9402076.

U.S. Army Court of Criminal Appeals.

24 Sept. 1996.

For Appellant: William J. Holmes, Esq. (argued); Captain Mark I. Goodman, JA (on brief).

For Appellee: Captain Chris A. Wendelbo, JA (argued); Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA; Captain John W. O'Brien, JA (on brief); Captain Virginia G. Beakes, JA.

Before CAIRNS, TOOMEY, and CARROLL, Appellate Military Judges.

OPINION OF THE COURT

CARROLL, Judge.

Appellant was tried before a general court-martial composed of officer and enlisted members. Contrary to his pleas he was found guilty of voluntary manslaughter and aggravated assault (two specifications) in violation of Articles 119 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 928 (1988)[hereinafter UCMJ]. The approved sentence consisted of a dishonorable discharge, confinement for fifteen years, forfeiture of all pay and allowances, and reduction to Private E1.

This case is before the court for automatic review pursuant to Article 66, UCMJ. We have considered the record of trial, the assignments of error, the governments' reply

thereto, those errors personally raised by the appellant, and the oral argument. Among other errors raised, the appellant asserts that the evidence was insufficient to overcome his claim of self-defense. We disagree and affirm.

### ARTICLE 66(c), UCMJ, FINDINGS OF FACT

Pursuant to Article 66(c), UCMJ, we make the following findings of fact. The appellant, a military policeman, was living in the barracks while his estranged wife and young daughter remained in government-owned quarters. On the day of the incident giving rise to the charges, the appellant called his wife and asked if she wanted him to come home that night. She told him not to come over because she was working until 2030 and the appellant had an early morning formation the next day. Late that afternoon, the appellant attended an informal gathering of soldiers in the company area. He drank beer but did not appear intoxicated. Around 2300, the appellant asked Specialist (SPC) Hobbs and Corporal (CPL) Foster to accompany him to the Green Goose, a night club in Wuerzburg. He made a point of taking his folding knife, which had a three to four-inch serrated blade. Specialist Hobbs, a nondrinker, agreed to drive the appellant's car. The appellant drank more beer at the Green Goose. Shortly after midnight, the appellant decided to leave the Green Goose.

Although the appellant's wife had told him not to visit her that evening, the appellant asked SPC Hobbs to drive him to his wife's apartment. The appellant became angry to discover that his wife was out. Surmising that she was, as he was quoted, "with a fucking guy," the appellant had SPC Hobbs drive by two clubs so that he could look for her. When he did not see her, he directed SPC Hobbs to go to the Way Out Club, a place he knew his wife frequented.

At the Way Out Club, the appellant left SPC Hobbs and CPL Foster in the car and entered the club. He greeted one of the club's bouncers, whom he knew. He was visibly angry as he surveyed the crowd for his wife, and he was further angered to find her dancing with another man. The appel-

lant was prepared to take whatever physical measures he found necessary, including the use of his knife, to get his wife away from her dancing partner.

The appellant belligerently shoved his way through the crowd to get to the dance floor. In anticipation of possible resistance, he had his opened knife in hand. Specialist Thayer was among those the appellant pushed out of his way. Specialist Thayer and some friends, including the other three victims, were celebrating SPC Thayer's birthday. Neither SPC Thayer nor SPC Willis, the victim who died, had been drinking. None of the victims had any prior connection with the appellant, the appellant's wife, or the individual dancing with the appellant's wife.

As the appellant shoved SPC Thayer, he recklessly, if not intentionally, cut SPC Thayer's arm with the knife. Specialist Thayer first realized the appellant had cut him after the appellant had pushed past him. On the dance floor, the appellant gave his wife's dancing partner a forceful shove and said to his wife, "What the hell are you doing here?" The appellant then dragged his wife from the dance floor.

As the appellant returned past SPC Thayer, SPC Thayer grabbed the appellant by the arm to confront him about his wound. The two stood in a face-off with SPC Willis yelling at the appellant from behind SPC Thayer. No blows had been exchanged when SGT Wesley saw the face-off, noted the appellant's anger, and intervened.

Sergeant Wesley came from behind the appellant, grabbed him around the neck, punched him in the ribs, and shoved him at least six feet away from SPC Thayer and himself in the direction of an exit. The appellant was separated from SPC Thayer, SPC Willis, and SGT Wesley when he stumbled to the ground. The appellant got to his feet and lunged back at SGT Wesley, stabbing him in the side. The appellant was not being assaulted or pursued when he stabbed SGT Wesley. Sergeant Wesley kicked at the appellant in a defensive measure as the appellant lunged at him.

Specialist Chavarri, a friend of the victims, then put a headlock on the appellant and was

punching him when the appellant stabbed SPC Chavarri, lacerating his liver.[1] Finally, the appellant mortally wounded SPC Willis who had been no more than a verbal participant. These three stabbings occurred within moments of each other. None of the surviving victims saw the knife.

The appellant and his wife left the club without interference and returned to his car. His visible injuries were a split lip and a small cut at the bridge of his nose. He also was bruised on his rib cage and had a scrape on his thigh. The appellant told CPL Foster that he had "put someone down" in the club. As SPC Hobbs drove the appellant and his wife back to her apartment, the appellant instructed his companions to say, should anyone ask, that they had only been at the Green Goose that evening. At the apartment, the appellant examined his injuries and changed his bloodied shirt. Still angry, he struck his wife in the face. He returned to the car and directed SPC Hobbs to drive him to a rest stop off a highway where he hid his knife among some bushes. The next morning, he learned that one of the victims had died, and later that day he was apprehended for questioning concerning his role in the stabbings.

## DISCUSSION

■ The appellant does not contest that he stabbed the victims, but he claims that he acted in self-defense. This special defense is available in homicides and in assault cases involving deadly force when (1) the accused reasonably apprehends that death or grievous bodily harm is about to be wrongfully inflicted upon the accused and (2) he believes that the deadly force used is necessary for protection against the death or grievous bodily harm. Rule for Courts–Martial 916(e)(1) [hereinafter R.C.M.]; *United States v. Martinez*, 40 M.J. 426, 430 (C.M.A.1994); *United States v. Aflague*, 40 M.J. 501, 502 (A.C.M.R. 1994). Factors going to the reasonableness of an individual's fear of imminent death or grievous bodily injury include the ability to withdraw or seek help or warn off the aggressors. *United States v. Clayborne*, 7 M.J.

528 (A.C.M.R.1979). The defense is not available if the accused is the aggressor or engaged in mutual combat. R.C.M. 916(e)(4). Nevertheless, an aggressor may in the course of events be entitled to use self-defense if an opposing party or parties escalate the level of conflict. *United States v. Henry*, 40 C.M.R. 818, 1969 WL 6204 (A.B.R. 1969). Also, as a self-defense measure, an individual may threaten more force than he could justifiably use. *United States v. Thomas*, 11 M.J. 315 (C.M.A.1981); *United States v. Bradford*, 29 M.J. 829 (A.C.M.R. 1989). When self-defense is raised by the evidence, the government must prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b) and (e).

■ Applying the law of self-defense to the facts of this case, we conclude from the evidence that the appellant did not act in self-defense when he cut SPC Thayer. Up to that point, appellant could not have reasonably apprehended any bodily harm because there had been no threats or altercation of any kind. Appellant's assault of SPC Thayer was completely unprovoked, and the appellant was the aggressor. Under these circumstances, self-defense is unavailable to him. R.C.M. 916(e)(4).

■ As to the aggravated assault on SGT Wesley, we conclude that SGT Wesley was the aggressor when he punched and shoved the appellant, and the appellant, having been attacked, was permitted to use force to defend himself. He could not, however, have reasonably apprehended imminent death or grievous bodily harm under the circumstances of that attack. Accordingly, the appellant was only permitted to use non-lethal force or to brandish his knife to deter further harm; SGT Wesley's attack on the appellant did not justify the use of deadly force.

Under some circumstances fists may constitute a means likely to produce grievous bodily harm, thus authorizing the use of deadly force [2], but those were not the facts in this case. When appellant chose to lunge at and stab SGT Wesley, he was physically

---

1. The appellant was found not guilty of assaulting SPC Chavarri.

2. *United States v. Martinez,* 40 M.J. 426 (C.M.A. 1994).

separated from his adversaries. At that point, none of the other participants had acted individually or collectively to expose the appellant to what could be reasonably perceived as life-threatening or grievous bodily harm, and nobody was pursuing him.[3] Instead of defending himself by non-deadly means or by displaying his knife, he used his knife as a lethal weapon with the angry aggression which characterized his actions from the time he entered the Way Out Club. We are convinced that appellant did not reasonably fear imminent death or serious bodily harm when he stabbed SGT Wesley. Therefore, his use of deadly force was not justified as self-defense.

Finally, we conclude that the appellant was not entitled to use deadly force against SPC Willis. Just before the appellant fatally stabbed SPC Willis, the appellant reestablished himself as the aggressor in applying deadly force against SGT Wesley. Specialist Chavarri's intervention by placing the appellant in a headlock and punching the appellant after the appellant had stabbed SGT Wesley did not revive appellant's right to self-defense.[4] Consequently, the appellant did not act in self-defense when he killed SPC Willis.[5]

We have reviewed the remaining errors and those raised personally by the appellant and find them to be without merit. The findings of guilty and the sentence are affirmed.

Senior Judge CAIRNS and Judge TOOMEY concur.

---

3. We note that the appellant had the opportunity to withdraw or to seek the help from the bouncers. These are factors relevant to assessing the reasonableness of an individual's fear of death or grievous bodily harm. *United States v. Clayborne,* 7 M.J. 528 (A.C.M.R.1979).

4. Although the appellant's acquittal of assaulting SPC Chavarri may be inconsistent with the trial court's finding of guilty of SPC Willis' murder, the inconsistency is not a basis for attacking the remaining guilty verdict. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

5. We do not need to address the subjective prong of self-defense with respect to the offenses against SGT Wesley or SPC Willis, but appellant's actions after leaving the club lead to the conclusion that he did not subjectively believe that the force he used was necessary.