*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
THE COURT EN BANC

_____

**UNITED STATES**
Appellee

**v.**

**Mickey W. JOHNSON, Jr.**
Private First Class (E-2), U.S. Marine Corps
Appellant

**No. 201800249**

Decided: 15 April 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Shane E. Johnson (arraignment)
Leon J. Francis (motions, trial)

Sentence adjudged 9 April 2018 by a general court-martial convened at Marine Corps Base Hawaii, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to pay grade E-1, forfeiture of all pay and allowances, confinement for 18 months, and a bad-conduct discharge.

For Appellant:
*Lieutenant Daniel E. Rosinski, JAGC, USN*

For Appellee:
*Lieutenant Kimberly Rios, JAGC, USN*
*Lieutenant Kurt W. Siegal, JAGC, USN*

Judge GASTON delivered the unanimous opinion of the Court.

_____

*16 Apr 2020: Administrative corrections made to pages 8 and 15.*

**PUBLISHED OPINION OF THE COURT**

––––––––––––––––––––––––

GASTON, Judge:

A panel of officer and enlisted members convicted Appellant, contrary to his pleas, of attempted voluntary manslaughter in violation of Article 80, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 880 (2012), for stabbing his roommate, Lance Corporal [LCpl] V, with a knife during a physical altercation in their barracks room.[1]

Appellant raises three assignments of error [AOEs]: (1) the military judge committed prejudicial error by (a) failing to instruct that Appellant could display knives in self-defense to deter LCpl V from attacking him, and (b) denying Appellant's request to instruct that he could respond to LCpl V's escalation of the conflict after his effort to deter LCpl V failed; (2) the Government failed to disprove beyond a reasonable doubt that Appellant acted against LCpl V in self-defense; and (3) the Government failed to prove beyond a reasonable doubt that Appellant intended to kill LCpl V. Having carefully considered each, we find merit in the first AOE and set aside the findings and sentence.

## I. BACKGROUND

Appellant and LCpl V were roommates who performed aircraft maintenance in the same unit on Marine Corps Base Hawaii. They met during preparatory schoolhouse training in Arizona and were on the same flight out to Hawaii, where they were assigned to the same barracks room, worked together daily, and socialized with one another. Over the course of their three weeks as roommates, however, the two were also prone to frequent verbal disagreements, which at times devolved into insults, aspersions, and name-calling, both at work and in their shared barracks room.

The roommates' recurrent bickering came to a head at work one morning when LCpl V asked Appellant to help him move some heavy equipment across their unit's hangar. Appellant declined, and the verbal sparring that ensued included LCpl V calling Appellant a "b[***]" and Appellant retorting that LCpl V "had a d[***] in his mouth" and wondering aloud whether he'd

––––––––––––––––––––––––

[1] Appellant was acquitted of the greater, charged offense of attempted murder.

rather see LCpl V "with his throat slit or set on fire."[2] The 6′5″, 200-pound LCpl V did not make much of the vituperative comments from the 5′9″, 140-pound Appellant—the likes of which he had often heard before—at least not until Appellant said he had slept with LCpl V's mother. At that point, LCpl V felt Appellant had "crossed the line" and became angry at him.[3] Appellant testified that when he made the comment about LCpl V's mother, LCpl V charged him, shoved him against a hard object, told him not to talk about his family anymore, and repeatedly told him for the rest of the day that they were going to fight after work.[4]

That afternoon, after LCpl V went to another worksite, Appellant completed his duties and returned to the barracks, scared about the prospect of fighting his much larger roommate. By the time LCpl V returned to their barracks room, Appellant was lying in bed listening to music with headphones, but had two open, spring-assisted knives on the bed next to him between himself and the wall. LCpl V changed into workout clothes, but before leaving for the gym, he threw a stuffed animal at Appellant's face, causing him to take off his headphones. LCpl V then told Appellant that when he returned from the gym, he wanted to talk about their verbal exchange earlier that day. According to Appellant, LCpl V said that when he got back from the gym, they were "going to fight."[5]

After listening to music for an hour or two, Appellant went to take a bath, taking the two knives with him in case LCpl V tried to jump him coming out of the bathroom. The barracks was organized into two-person rooms with adjoining bathrooms in between that could be accessed from either side. It was possible to lock the bathroom doors from the outside—i.e., to prevent someone from entering the barracks rooms from the bathroom—and the bathroom doors were often kept shut and locked in this manner. However, it was not possible to lock anyone out of the bathroom. Thus, while there were two ways to enter or leave a barracks room, only one was typically availa-

---

[2] Record at 1205. LCpl V testified Appellant also said LCpl V "would get to choose which one of [his] knives he would slit my throat with." Record at 705.

[3] Record at 760-61, 765.

[4] Record at 1206-07. LCpl V in his testimony disputed doing any of these other actions.

[5] Record at 1212. LCpl V in his testimony denied making any such statement to Appellant or others. Record at 734, 763, 766, 768, 796.

ble—the main barracks room door—which was accessible from the outside with the resident's military identification card.

On hearing LCpl V return from the gym, Appellant finished his bath, changed into shorts and a T-shirt, and went back into their barracks room, holding the two knives concealed under a towel. Appellant testified that he had the knives under the towel "[b]ecause if the situation had calmed down, [he] didn't want [LCpl V] to see the knives and think, Oh, he's going to kill me."[6] He testified that he did not want to fight LCpl V and that his intent with the knives was only to scare off LCpl V if LCpl V decided to attack him. He walked past LCpl V toward the main barracks room door, as LCpl V was walking toward the bathroom door.[7] The roommates then turned to face each other, a few feet apart, and LCpl V asked Appellant, loudly enough to be overheard by a Marine in the adjoining barracks room on the other side of the bathroom, "So what do you have to say about my mother now?"[8]

Appellant testified that on hearing this he felt scared and dropped the towel to reveal the two open knives he was holding. He testified that in light of LCpl V's earlier statements, he believed LCpl V intended to fight him and that he displayed the knives in an effort to scare off LCpl V. He testified that upon seeing the knives LCpl V said, "So we're going to bring knives into this?" and in response, Appellant said something along the lines of "It sure seems like that" or "I guess so."[9]

LCpl V testified that after he turned to face Appellant and asked if he was going to continue making comments about his family, Appellant said, "I'll do whatever I want," and then threw down the towel and immediately flipped open the spring-assisted knife he held in each hand.[10] LCpl V testified that upon seeing the knives he became afraid and instinctively shoved Appellant into a wall locker. He testified that Appellant then lunged back and swung the knives at him, and that he (LCpl V) raised his arms up to defend himself and was struck by both knives in his upper body. He then grabbed Appel-

---

[6] Record at 1215.

[7] Appellant testified that LCpl V actually reached the bathroom door and proceeded to lock it, which would have prevented the Marines in the adjoining room from being able to enter LCpl V and Appellant's barracks room via the bathroom.

[8] Record at 1216.

[9] Record at 1217. LCpl V disputed this verbal exchange.

[10] Record at 710-11, 775-77, 790.

lant's wrists, and a struggle ensued in which LCpl V ended up on top of Appellant, on the bed closest to the main door, knocking Appellant's hands against the wall in an effort to make him drop the knives. LCpl V yelled at Appellant to drop the knives, and Appellant responded he would not drop them until LCpl V got off him. As they continued to struggle, Appellant inflicted cuts on LCpl V's forearm and hand, and Appellant received cuts on each of his own legs. He then kicked at LCpl V in the chest and jaw, causing LCpl V to lose his grip on Appellant's wrists. At that point, LCpl V broke away to the room's exterior door and ran toward the nearby duty shack, calling for help.

Appellant testified he was not sure whether LCpl V shoved him first, but that after their verbal exchange, once Appellant showed him the knives, LCpl V assumed a "boxer stance" and reached for the knife in Appellant's right hand. Appellant testified he took this as a threatening action and was afraid that if LCpl V was able to get the knife away from him, he would use the knife against Appellant. In response, Appellant testified he instinctively brought up his right hand—the hand LCpl V was reaching for—and stabbed LCpl V in the shoulder. He testified that LCpl V then grabbed both of his wrists and pinned him to the bed, and he began stabbing at LCpl V with the knife in his right hand in an effort to get LCpl V off of him. He then began kicking at LCpl V until eventually LCpl V got off of him and ran out of the room.

After LCpl V fled toward the duty shack, Appellant went into the shared bathroom, and the Marines in the adjoining room unlocked and opened the door from their side. They smelled blood and observed Appellant to be calm, but scared. Appellant said to them, "I might be going to jail tonight." When they asked why, he responded, "Just know that I hate [LCpl V]."[11] The Marines followed Appellant into his room, noticed bloodstains on the curtains and wall, and saw Appellant put down two knives. When security personnel arrived, he followed their orders and was apprehended without incident.

LCpl V was taken to a military hospital and treated for cuts on his shoulders, clavicle, arm, and hand. Appellant declined medical treatment for the cuts on his legs.

Additional facts necessary to resolution of the issues are contained in the discussion.

---

[11] Record at 836.

## II. DISCUSSION

At trial, the parties agreed the issue of self-defense was raised by the evidence and warranted instructions. Where they differed was that the Defense requested tailored instructions to address the specific issues raised by Appellant's testimony: that he displayed the knives in an effort to deter LCpl V from attacking him, and that he only used them after LCpl V, rather than backing down, shoved Appellant into a wall locker and then tried to grab one of the knives. The military judge denied the Defense request for tailored instructions.

Here, as at trial, Appellant asserts that the self-defense instructions the military judge gave the members were incomplete, and that the military judge committed prejudicial error by denying the Defense request to instruct that (a) a person can display a deadly weapon (i.e., knives) in self-defense in order to deter an assailant from attacking, and (b) if the effort to deter the assailant fails and the assailant escalates the level of conflict, a person can respond to the escalation by using the deadly weapon in self-defense.

### A. Standard of Review

"The military judge's instructions are intended to aid the members in the understanding of terms of art, to instruct the members on the elements of each offense and to explain any available defenses." *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006); *see also* Rule for Court-Martial [R.C.M.] 920(e). The instructions "should fairly and adequately cover the issues presented, and should include such other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, sua sponte, should be given." *United States v. Bailey*, 77 M.J. 11, 13-14 (C.A.A.F. 2017) (citing R.C.M. 920(a), Discussion; R.C.M. 920(e)(7)). "If an issue has been raised, ordinarily the military judge must instruct on the issue when requested to do so." R.C.M. 920(c), Discussion. "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." R.C.M. 920(e), Discussion. The military judge has "wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012).

We generally review the propriety of instructions given by the trial court de novo. *United States v. Quintanilla*, 56 M.J. 37, 83 (C.A.A.F. 2001). But because the military judge has "substantial discretionary power" in determining whether to give tailored instructions requested by counsel, we review the military judge's denial of counsel-requested instructions for an abuse of discretion. *Bailey*, 77 M.J. at 14 (quoting *United States v. Damatta-Olivera,*

37 M.J. 474, 478 (C.M.A. 1993)); *United States v. Carruthers*, 64 M.J. 340, 345-46 (C.A.A.F. 2007). To assess whether the military judge erred in not providing a requested instruction, we employ a three-part test that looks at whether:

> (1) the requested instruction is correct; (2) the main instruction given does not substantially cover the requested material; and (3) the instruction is on such a vital point in the case that the failure to give it deprived [the Accused] of a defense or seriously impaired its effective presentation.

*Bailey*, 77 M.J. at 14 (citations and internal quotation marks omitted). "All three prongs must be satisfied for there to be error." *Id.* (citing *United States v. Barnett*, 71 M.J. 248, 253 (C.A.A.F. 2012)).

## B. The Law of Self-Defense

The instructions at issue here involve several well-known principles of the law of self-defense. The confluence of these principles, perhaps less well-known, is what gives rise to Appellant's assertion of error.

"Generally speaking, a person is not entitled to use a dangerous weapon in self-defense where the attacking party is unarmed and commits a battery by means of his fist." *United States v. Straub*, 30 C.M.R. 156, 160 (C.M.A. 1961). However, there is no "absolute prohibition against the use of a deadly weapon to repel an unarmed assault," particularly where a person is outsized or outnumbered; otherwise, it would mean "the assaulted party must stand and take his chances of being knocked down and stamped into a jelly . . . before he can lawfully use a weapon in his defense." *United States v. Black*, 31 C.M.R. 157, 161 (C.M.A. 1961) (citation and internal quotation marks omitted). In such situations, the law allows "[l]ittle men, as well as those physically more fortunate . . . to take reasonable measures in order to protect themselves," and ultimately, "whether an accused, by resort to a weapon, uses excessive force in repelling an assault upon him is dependent upon all of the circumstances." *Id.*

In addition to *using* a deadly weapon in self-defense, the law allows that "for the purpose of frightening an assailant, one might *threaten* to resort to more force than [one] may permissibly, under the law, actually employ in self-defense." *United States v. Acosta-Vargas*, 32 C.M.R. 388, 393 (C.M.A. 1962) (emphasis added); *see also United States v. Stanley*, 71 M.J. 60, 64 (C.A.A.F. 2012) (Baker, J, concurring) ("An individual who is entitled to act in self-defense may *threaten* a greater degree of force than that which he or she could actually *use*.") (emphasis added) (citation omitted). In recognition of this principle, the Military Judges' Benchbook contains a section of pattern instructions entitled, "Excessive Force to Deter," to address situations where

an accused displays or threatens deadly force to deter an attack. Dept. of the Army Pamphlet 27-9 para. 5-2-5 (10 Sept. 2014) [Benchbook].

Finally, the principle of escalation of force recognizes that conflicts often come in stages or must be "viewed as a series of altercations," as the analysis of each stage may impact the right of self-defense. *Stanley*, 71 M.J. at 69 (Baker, J, concurring); *see also United States v. Cardwell*, 15 M.J. 124, 126 (C.M.A. 1983) ("Even a person who starts an affray is entitled to use self-defense when the opposing party escalates the level of conflict."). Whether an escalation occurs depends on at least two factors: (1) who started the fight and (2) at what level of force. In situations involving deadly force, these two factors, in turn, depend on whether deadly force is *used* to attack or merely *displayed* to deter an attack.

Generally, if A *uses* deadly force to attack B, A is not entitled to self-defense if B strikes back; and there is no way B can escalate the level of conflict (because A has already fully escalated the situation by using deadly force). However, if A merely *displays* deadly force to deter B from an assault, then A is entitled to use some level of force in self-defense if B nevertheless attacks A; and if B escalates the level of conflict by being the first to use deadly force, then A would be entitled in response to *use* deadly force in self-defense.

The line between *using* deadly force to attack and *displaying* deadly force to deter is thus all-important, and not always clearly defined. In *United States v. Stanley*, for example, our superior court divided on this very issue. 71 M.J. 60 (C.A.A.F. 2012). That case involved a four-member drug ring that fragmented and turned on itself. *Id.* at 62. First, after accusing him of sleeping with his wife, Werner began a fight with Colvin, which Hymer soon joined on the side of Werner. When Colvin called for help, Stanley intervened with a pistol, at a point when the conflict involved only non-deadly force. *Id.* Stanley then held Werner and Hymer at gunpoint and searched them for weapons. Hymer grabbed a rifle and shot at Stanley, who returned fire with the pistol, killing Hymer. Werner then grabbed a knife and attempted to stab Colvin, at which point Stanley shot and killed Werner. *Id.*

The issue on appeal was whether Stanley was entitled to a self-defense (or defense-of-another) instruction tailored to include the principle of escalation of force. *Id.* at 62. The majority concluded Stanley had already escalated the level of conflict to one involving deadly force by *using* the pistol to subdue Hymer and Werner and search them for weapons. *Id.* at 63. The concurrence disagreed, concluding that Stanley at that point was only *displaying* a deadly weapon and so had not escalated the level of conflict to one involving the *use* of deadly force. *Id.* at 72 (Baker, J, concurring). However, both sides agreed, at least in principle, that:

> One may deliberately arm himself for purposes of self-defense against a pernicious assault which he has good reason to expect. On the other hand, the true significance of the fact of arming can be determined only in the context of the surrounding circumstances.

*Id.* at 63 (quoting *United States v. Peterson*, 483 F.2d 1222, 1233 (D.C. Cir. 1973); *see also Stanley*, 71 M.J. at 64 (Baker, J, concurring) (concluding that the issue is ultimately "fact-based," requiring "careful review of the facts from both [key witnesses'] perspective[s]"). We take up that fact-based review of the surrounding circumstances in this case by addressing each of the requested tailored instructions, in turn.

**C. Analysis**

*1. Proposed Defense instructions on display of excessive force to deter*

The first set of tailored self-defense instructions Appellant sought at trial were submitted to address Appellant's testimony that he only brought out his knives in an effort to scare off LCpl V, who according to Appellant had been spoiling for a fight ever since Appellant insulted his mother. The requested instructions were drawn from the Benchbook's "Excessive Force to Deter" pattern instructions, which are specifically designed for circumstances where an accused displays or brandishes a weapon in order to deter an assault. Benchbook, para. 5-2-5. Appellant's requested instructions read, in pertinent part:

> There is evidence in this case that PFC Johnson brandished two knives solely to defend himself by deterring LCpl [V] rather than for the purpose of actually injuring LCpl [V].

> A person may, acting in self-defense, in order to frighten or discourage an assailant, threaten more force than he is legally allowed to actually use under the circumstances.

> An accused who reasonably fears an immediate attack is allowed to brandish ordinarily dangerous weapons, such as knives, even though the accused does not have a reasonable fear of serious harm, as long as he does not actually use the weapons in a manner likely to produce grievous bodily harm.

> Whether PFC Johnson was using the two knives as a deterrent, or was using them in a manner likely to cause death or grievous bodily harm, is for you to decide. Your determination rests on two factors. First, PFC Johnson must have reasonably and honestly believed that LCpl [V] was about to inflict some

bodily harm on PFC Johnson. . . . Second, the accused must have intended to use, and must in fact have used, the knives only as a deterrent and not in a manner likely to produce death or grievous bodily harm.

If you are satisfied beyond a reasonable doubt that the accused brandished the knives in a manner likely to produce death or grievous bodily harm, rather than merely threatening their use to deter LCpl [V], the defense of self-defense does not exist.[12]

Appellant argues these requested instructions were necessary because Appellant was a "little man" who had a legal right to take reasonable measures to protect himself, "rather than take [the] chance[ ] of being knocked down and stamped into a jelly."[13] The Defense emphasized that a fight with LCpl V would not just be a brief dust-up. Against the 60-pound lighter and nine-inch shorter Appellant, LCpl V's bare fists would impart a severe beating and substantially risk grievous bodily harm in and of themselves. Given Appellant's comparatively diminutive size and fear of the much bigger LCpl V if they fought, the Defense argued Appellant's sound option to ward off such an attack was to brandish knives in a show of force to deter LCpl V from fighting him to begin with.[14]

The military judge denied the Defense's request for these tailored instructions, determining that the excessive-force-to-deter instructions are "only applicable if the Accused does not actually use the weapons that he is threatening the other person with."[15] Since Appellant ended up stabbing LCpl V with the knives that he initially brandished, the military judge

---

[12] App. Ex. LXI at 7-8; Appellant's Br. at 12.

[13] Record at 1352; Appellant's Reply Br. at 14 (quoting *United States v. Black*, 31 C.M.R. 157, 161 (C.M.A. 1966) (internal quotation marks omitted)).

[14] Record at 1054 ("show of force to deter" and "did not want to get a beating"), 1055 ("He armed himself with two knives. And his intent was to scare [LCpl V] so that he wouldn't give him that beating."), 1406 ("He's getting ready to carry on through the threat and all Johnson does is drop the towel and show him the knives. 'Not today, I'm not gonna stand here and just let you beat on me until, you know, my face looks like some puddle of jelly. That's not how it is. Yeah, I'm a little guy, I'm 140 pounds. But I'm not going to let it happen. Back off.'"), 1407 ("And all he did was use the show of force to say, back off. I'm not going to eat this beating.").

[15] Record at 1349.

reasoned the requested instructions about *display* of force to deter did not apply. Consequently, the self-defense instructions the military judge provided were focused only on the *use* of force, in pertinent part as follows:

> For self-defense to exist, the Accused must have had a reasonable apprehension that death or grievous bodily harm or some lesser degree of harm was about to be inflicted on himself, and he must have actually believed that the force he used was necessary to prevent death or harm to himself.
>
> . . . .
>
> . . . If the Accused reasonably apprehended that death or grievous bodily harm was about to be inflicted upon himself, then he was permitted to use any degree of force actually believed necessary to protect against death or grievous bodily harm. The fact that the Accused used excessive force, if you believe that, or that he used a different type of force than that used by the attacker does not matter.
>
> If the Accused reasonably apprehended that some harm less than death or grievous bodily harm was about to be inflicted upon his person, he was permitted to use the degree of force actually believed necessary to prevent that harm. However, the Accused could not use force that was likely to produce death or grievous bodily harm. The Accused was not required to use the same amount or kind of force as the attacker.
>
> To determine the Accused's actual belief as to the amount of force, which was necessary, you must look at the situation through the eyes of the Accused. In addition to the circumstances known to the Accused at the time, the Accused's age, intelligence, and emotional control, as well as the relative height, weight, and general build of the Accused and the alleged victim are all important factors to consider in determining the Accused's actual belief about the amount of force required to protect himself.[16]

Based on the evidence admitted at trial, we conclude the military judge abused his discretion when he declined to provide the Defense-requested

---

[16] Record at 1369-71.

instructions on the display of excessive force to deter. Analyzing the requested instructions under the three-part test outlined in *United States v. Bailey*, we find that first, the requested instructions are legally correct. They are drawn directly from the excessive-force-to-deter instructions in the Benchbook that are specifically designed to address the issue raised by Appellant's testimony—that he initially brandished the knives only to deter LCpl V from attacking him.

The military judge's conclusion that the excessive-force-to-deter instructions are only applicable if the Accused does not ultimately use the weapon that he brandished is incorrect. While the military judge did not cite any particular case for this proposition,[17] his reasoning may have stemmed from *United States v. Williams*, in which this Court found no error in the trial court's refusal to give excessive-force-to-deter instructions where the appellant stabbed the victim in the back while being held over the victim's shoulder and slammed against a brick wall. 2005 CCA LEXIS 320, at *10-11 (N-M. Ct. Crim. App. 2005) (unpub. op.). That case is distinguishable, however, because there the evidence made "clear that the appellant *did not threaten the force* before using the force in a manner that could result in grievous bodily harm." 2005 CCA LEXIS 320, at *23 (emphasis added). Indeed, in *Williams*, the victim neither saw the knife nor realized he had been stabbed in the back until after he put the appellant down and saw blood. *Id.* at *10.

Where the evidence supports that a deadly weapon is being displayed or brandished as a means of deterring an assault in self-defense, prior to actually being used as a weapon, *both* issues must be separately analyzed and, where appropriate, instructed upon. Our sister court held as much in *United States v. Bradford*, 29 M.J. 829 (A.C.M.R. 1989). In that case, after being verbally challenged and then punched in the face by the victim, the appellant brandished a switchblade knife in his hand in an effort to deter the victim from further assaulting him. *Id.* at 831. Undeterred, the victim nevertheless advanced on the appellant, grappled with him, and continued to

---

[17] In his oral ruling declining to provide the Defense-requested instructions, the military judge provided little specificity in stating: "The reason I didn't is because I read the case law on this and that particular instruction is only applicable if the Accused does not actually use the weapons that he is threatening the other person with. And so that, according to case law supports this particular instruction, the fact that he did use them would make this particular instruction inapplicable." Record at 1349.

hit him with his fists, at which point the appellant stabbed him. The Army Court of Military Review held that "both the infliction of and the offer to inflict grievous bodily harm in self-defense were in issue . . . and should have been instructed on by the military judge." *Id.* at 833. The military judge thus erred when he merely instructed on the display of force to deter an attack but not the actual use of force in self-defense once an attack was mounted.

Under the facts and circumstances of this case, both the offer to inflict (by *displaying* the knives) and the actual infliction of (by *using* the knives) grievous bodily harm in self-defense were in issue and should have been instructed upon by the military judge. Based on Appellant's testimony, he initially brandished the knives in an effort to deter LCpl V from attacking him—in immediate response to provoking language from LCpl V and in the wake of LCpl V's repeated earlier statements that they would fight that day.[18] Appellant testified he brandished the knives for a time period long enough to exchange comments with LCpl V about them, before LCpl V made the first physically aggressive move. This testimony warranted instructing the members that the law allows a display of excessive force (in this case, knives) in self-defense as a means of deterring an assault.[19]

---

[18] And unlike the appellant in *Stanley*, who brandished a pistol not just to break up a fight (in defense of Colvin), but also to subdue his opponents and check them for weapons, the evidence in this case supports the view that when Appellant initially displayed the knives, he was not *using* them for anything other than trying to get LCpl V to back down. *Cf. Stanley*, 71 M.J. at 63.

[19] We reject the Government's argument that an excessive-force-to-deter instruction is somehow prohibited by the language of R.C.M. 916(e)(2), simply because Appellant was ultimately convicted of attempted voluntary manslaughter. Even if that rule could be read to apply *only* to aggravated assaults, which is itself a dubious proposition, we find that with respect to the initial confrontation in the barracks room the issue is precisely whether (1) Appellant was acting lawfully in self-defense because he (a) reasonably apprehended LCpl V was about to assault him and (b) *offered* to apply means as would be likely to cause death or grievous bodily harm (i.e., brandished knives) in order to deter LCpl V from attacking; or (2) Appellant's brandishing of the knives was already an unlawful, offer-type aggravated assault (which impacts whether Appellant could ever regain the right of self-defense from that point forward). *See* R.C.M. 916(e)(2). This issue is very similar to the one our superior court confronted, and divided on, in *Stanley*, and ultimately found could "be determined only in the context of the surrounding circumstances." *Stanley*, 71 M.J. at 63 (internal quotation marks and citation omitted).

We also emphasize in this regard that, while it is important for military judges to be even-handed in their approach to the evidence, "the testimony of the accused alone is sufficient to raise an issue requiring an instruction." *Bradford*, 29 M.J. at 832 (citing *United States v. Wilson*, 26 M.J. 10 (C.M.A. 1988); *United States v. McGee*, 1 M.J. 193 (C.M.A. 1975); *United States v. Stewart*, 43 C.M.R. 140, 145 (C.M.A. 1971); *United States v. Evans*, 38 C.M.R. 36 (C.M.A. 1967)). As the court in *Bradford* aptly stated,

> It is not necessary that the evidence which raises an issue be compelling or convincing beyond a reasonable doubt. Instead, the instructional duty arises whenever "some evidence" is presented to which the fact finders might "attach credit if" they so desire.

*Bradford*, 29 M.J. at 832 (citing *United States v. Jackson*, 12 M.J. 163, 166-67 (C.M.A. 1981)); *see also United States v. Taylor*, 26 M.J. 127, 129 (C.M.A. 1988). Moreover, "any doubt whether the evidence is sufficient to require an instruction should be resolved in favor of the accused." *Bradford*, 29 M.J. at 832 (quoting *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981)) (internal quotation marks omitted).

Under the second prong of the test outlined in *United States v. Bailey*, we find that the self-defense instructions given by the military judge, while themselves legally correct, do not substantially cover the issue of threatening or displaying excessive force as a means of deterring an attack. As the military judge himself acknowledged, his instructions do not address the issue of *displaying* force to deter at all, since he believed such instructions were not applicable. Instead, his instructions jump directly to the *use* of force in self-defense. But since the law specifically allows an accused to threaten more force than he would be allowed to actually use under the circumstances, as a means of frightening or discouraging an assailant, and this issue was raised by the evidence, it merited attention and explanation in the instructions.

While the military judge's instructions did discuss the Accused's ability to "use any degree of" force he believed necessary (under certain circumstances and with certain limitations), this language does not adequately cover the issue of displaying or threatening deadly force. First, the idea that displaying a weapon is somehow automatically encompassed as a "degree of use" of that weapon is not supported by the case law, which draws a clear distinction between "displaying" or "threatening" deadly force and actually "using" such force. *See Stanley*, 71 M.J. at 72 ("It is well established that the mere threat of the use of deadly force is not the same as the actual use of deadly force.") (Baker, J, concurring); *United States v. Martinez,* 40 M.J. 426 (C.M.A. 1994) (distinguishing between use of a knife as a deterrent and use of a knife in a

manner likely to "inflict grievous bodily harm"); *United States v. Vargas-Acosta,* 32 C.M.R. 388, 393 (C.M.A. 1962) (distinguishing the use of a dangerous weapon as a "deterrent" to an assault from an "aggressive" use of such weapon to "attempt to take life or inflict grievous bodily harm").[20]

Second, the blending of such terms with distinct, everyday meanings does not comport with the duty of trial judges to ensure that their instructions "provide an accurate, complete, and *intelligible* statement of the law." *Behenna*, 71 M.J. at 232 (emphasis added). As our superior court announced in *Stanley*, "[o]ne may deliberately arm himself for purposes of self-defense against a pernicious assault which he has good reason to expect." 71 M.J. at 63 (quoting *Peterson*, 483 F.2d at 1233). Certainly, "arming" oneself is different than "using" or "employing" those arms; just as "offering to use" deadly force is different than "actually using" such force. *See United States v. Marbury,* 56 M.J. 12, 19 (2001) (Gierke, J, dissenting) ("A defender may lawfully defend herself by *offering to use* deadly force, without intending to *actually use* it, if she reasonably believes that the attacker is about to inflict any bodily harm, not necessarily death or grievous bodily harm.") (emphasis added). This legal distinction between "displaying" and "using" a deadly weapon in self-defense is vital to fully evaluating the issue in the context of the surrounding circumstances.

Here, in failing to differentiate between the lawful display and the lawful use of the knives, the military judge's self-defense instructions were ultimately inadequate and misleading. The inadequacy of the instructions was made clear during closing arguments, where the Government maintained:

> If PFC Johnson had felt that there was some lesser force other than . . . death or grievous bodily harm, then he could use that degree of force necessary to deter someone, but not deadly force. And that's what PFC Johnson deployed when he clicked open both knives in front of [LCpl V]. In his own words, he brought weapons that were deadly that could kill someone to that interaction. He responded to words with deadly weapons.[21]

---

[20] Indeed, blurring this clear distinction would essentially ignore every case precedent upon which excessive-force-to-deter instructions are based and render superfluous that entire section (5-2-5) of the Benchbook.

[21] Record at 1392 ~~(emphasis added)~~.

This argument is not only misleading to the point of being an inaccurate statement of the law, but was fostered by the trial court's self-defense instructions, which failed to distinguish between when a person may lawfully *display* deadly force and when a person may lawfully *use* deadly force. The point of the excessive-force-to-deter instructions is to inform the members that in self-defense an accused *can* lawfully display deadly force to deter someone from assaulting him (even in response to mere words signaling an attack is imminent). Without the more tailored instructions requested by the Defense, this important nuance is simply lost.

On the third prong of the *Bailey* test, we conclude the Defense-requested instructions were on an issue so vital to the case that the failure to give the requested instructions seriously impaired the effective presentation of Appellant's defense of self-defense. The Defense's whole theory was premised on demonstrating that Appellant's small size made him vulnerable if the much larger LCpl V engaged him in a fistfight, the danger of which made it reasonable for Appellant to resort to arming himself—and eventually brandishing those arms—as a means of trying to avoid the fight altogether.[22] Indeed, where the 5´8˝, 140-pound Appellant was facing a beating from his 6´5˝, 200-pound roommate, and testified that he brandished his knives to try to deter his roommate from attacking him, the military judge's failure to provide the Defense-requested instruction completely undercut Appellant's defense.

### 2. Proposed Defense instructions on escalation of force

The second set of tailored self-defense instructions Appellant sought at trial were based on pattern instructions in the Benchbook for circumstances where an adversary escalates the level of conflict. *See* Benchbook, para. 5-2-6, Note 8. The instructions submitted by the Defense were designed to address the issues raised by Appellant's testimony that after he brandished the knives to scare off LCpl V, the undeterred LCpl V assumed a "boxer stance" and reached for one of the knives. Appellant testified that at that point he was afraid not just of getting pummeled by his much larger roommate's fists, but also of getting stabbed with his own knife. In that context Appellant testified he instinctively brought up his right hand—the hand LCpl V was reaching for—and stabbed LCpl V in the shoulder (and then inflicted other

---

[22] The Defense counsel's opening statement was that Appellant "didn't want to get a beating from [LCpl V]. He armed himself with two knives. And his intent was to scare [LCpl V] so that he wouldn't give him that beating." Record at 1053.

cuts once LCpl V grabbed Appellant's wrists and pinned him to the bed, in an effort to get LCpl V off of him). The Defense-requested instructions read, in pertinent part:

> I just instructed you that an accused who reasonably fears an immediate attack is allowed to brandish ordinarily dangerous weapons, such as knives, even though the accused does not have a reasonable fear of serious harm, as long as he does not actually use the weapons in a manner likely to produce grievous bodily harm, but there is an exception to that instruction.
>
> If a person, in order to frighten or discourage an adversary, brandishes ordinarily dangerous weapons such as knives, and that effort to deter is unsuccessful and the adversary escalates the level of conflict, then the accused was entitled to act in self-defense if he was in reasonable apprehension of immediate death or grievous bodily harm. Therefore, if the adversary escalated the level of the conflict to one involving force likely to produce death or grievous bodily harm and thereby placed the accused in reasonable apprehension of immediate death or grievous bodily harm, the accused was entitled to use force he actually believed was necessary to prevent death or grievous bodily harm.
>
> Accordingly, if you have a reasonable doubt that the adversary did not escalate the level of conflict to one involving force likely to produce death or grievous bodily harm and thereby placed the accused in reasonable apprehension of immediate death or grievous bodily harm, the accused was entitled to act in self-defense. You must then decide if the accused acted in self-defense.[23]

The military judge denied the Defense request and only provided the standard Benchbook instructions on the escalation of force (which the Defense also requested to follow its proposed tailored instructions):

> There exists evidence in this case that the Accused may have intentionally provoked the incident or voluntarily engaged in mutual fighting. A person who intentionally provoked an attack upon himself or voluntarily engaged in mutual

---

[23] App. Ex. LXI at 8; Appellant's Brief at 12-13.

fighting is not entitled to self-defense unless he previously withdrew in good faith or unless it was physically impossible for him to withdraw in good faith or unless the adversary escalated the level of conflict.

A person has provoked an attack and therefore given up the right to self-defense if he willingly and knowingly does some act toward the other person reasonably calculated and intended to lead to a fight or deadly conflict. Unless such act is clearly calculated and intended by the Accused to lead to a fight or deadly conflict, a right to self-defense is not lost.

. . . If you are convinced beyond a reasonable doubt that the Accused intentionally provoked an attack upon himself so that he could respond by injuring or killing [LCpl V] or voluntarily engaged in mutual fighting, then you have found that the Accused gave up his right to self-defense. However, if you have a reasonable doubt that the Accused intentionally provoked an attack upon himself, or voluntarily engaged in mutual combat, then you must conclude that the Accused retained the right to self-defense and then you must determine if the Accused actually did act in self-defense.

Even if you find that the Accused intentionally provoked an attack upon himself or voluntarily engaged in mutual fighting, if the adversary escalated the level of the conflict then the Accused was entitled to act in self-defense if he was in reasonable apprehension of immediate death or grievous bodily harm. Therefore, if the Accused intentionally provoked an attack upon himself by using force not likely to produce death or grievous bodily harm or voluntarily engaged in mutual fighting not involving force likely to produce death or grievous bodily harm and the adversary escalated the level of the conflict to one involving force likely to produce death or grievous bodily harm, then thereby placed the Accused in reasonable apprehension of immediate death or grievous bodily harm, the Accused was entitled [to] use force he actually believed was necessary to prevent death or grievous bodily harm.

Accordingly, even if you find beyond a reasonable doubt that the Accused intentionally provoked an attack upon himself by using force not likely to produce death or grievous bodily harm or voluntarily engaged in mutual fighting not involving force likely to produce death or grievous bodily harm, but you have a reasonable doubt that the adversary did not escalate the

18

level of the conflict to one involving force likely to produce
death or grievous bodily harm and thereby placed the Accused
in reasonable apprehension of immediate death or grievous
bodily harm, the Accused was entitled to act in self-defense.
You must then decide if the Accused acted in self-defense.[24]

Analyzing the requested instructions under the three-prong test outlined in *Bailey*, we conclude the military judge erred in not providing them as well. First, the requested instructions are legally correct. Derived from the Benchbook instructions on escalation of force, they are appropriately tailored to address the issue raised by Appellant's testimony that after displaying the knives failed to deter LCpl V from attacking him, he began using them when LCpl V actually reached for one of the knives.[25] The use of such instructions under the circumstances of this case is supported by a variety of case precedents. *See, e.g., Martinez*, 40 M.J. at 428 (finding it error not to instruct appellant could use knife when brandishing it failed to deter assailants who were unarmed but outnumbered and outsized appellant enough to justify use of dangerous weapon in self-defense); *Black*, 31 C.M.R. at 161 (finding no absolute prohibition against using a deadly weapon to repel unarmed assault; otherwise it would mean "the assaulted party must stand and take his chances of being knocked down and stamped into a jelly . . . before he can lawfully use a weapon in his defense") (citations and internal quotation marks omitted); *United States v. Bransford*, 44 M.J. 736, 738 (A.C.C.A. 2006) (finding that under some circumstances fists can constitute means likely to produce grievous bodily harm, authorizing use of deadly force).

Second, the more limited escalation instructions given by the military judge, while drawn from the Benchbook, do not substantially cover the issue of escalation in the context of initially brandishing a weapon as a means of deterring an attack. On their face, the military judge's escalation instructions only apply where the members find that the Accused "intentionally provoked an attack" upon himself or "voluntarily engaged in mutual fighting." While those issues may also have been raised by the evidence, the military judge's instructions do not address the contextual issue raised by Appellant's testimony that after the *display* of deadly force failed to deter LCpl V from attacking him, the level of force *used* escalated as a result of LCpl V's actions.

---

[24] Record at 1373-75.

[25] Even on LCpl V's account, it was LCpl V who made the first physically aggressive move, shoving Appellant into a wall locker after seeing the knives.

Rather, the instructions as given compound the problem caused by the failure to give the requested excessive-force-to-deter instructions to the point of suggesting that at the beginning of the standoff, the Accused could only be viewed as already legally in the wrong.

Having never been informed of a person's legal right to *display* a deadly weapon to try to avoid a fight, then unless they were convinced Appellant reasonably apprehended death or grievous bodily harm was about to be inflicted on him when he brought out the knives, the members were left with the conclusion that Appellant was legally in the wrong for pulling out the knives in the first place. In other words, once Appellant brought his knives out from under the towel (which would almost certainly appear unlawful absent the excessive-force-to-deter instructions), the members would naturally conclude he was already "using" force likely to produce death or grievous bodily harm.[26] Thus, it would be extraordinarily difficult for them to find under the escalation instructions given that it was even possible for LCpl V to escalate the conflict (because, based on the way the two sets of instructions were written, Appellant had already escalated the conflict by pulling out his knives in the first place).

This instructional scheme left the Defense little or no basis in the instructions to argue that Appellant retained the right of self-defense because LCpl V's actions escalated the conflict. As the Defense explained during its opening statement,

> What [Appellant] intend[s] is once [LCpl V] sees [the knives] he thinks [LCpl V] will back off, but he does not. Instead what he does is he comes at him and grabs for the knives and now [Appellant] is in a fight for his life.[27]

The Defense intended to make this argument in closing with reference to its requested tailored instructions; however, when the military judge refused to give the Defense-requested instructions, the Defense was forced to withdraw language from its closing slides and argument that would have clarified and vastly strengthened the presentation of its self-defense case on these pivotal issues.[28] That left the Defense with a watered-down version of

---

[26] *See supra*, note 21 and accompanying text.

[27] Record at 1061.

[28] Record at 1352-56.

its self-defense argument—the centerpiece of its entire theory of the case—deprived of any real purchase in the actual language of the instructions.

By contrast, the Government hammered down on precisely the issue caused by the erroneous instructions, arguing in its own closing slides that Appellant was "NOT ENTITLED to the Right of Self Defense" because he "*EMPLOYED* DEADLY FORCE IN RESPONSE TO A QUESTION."[29] This misleading argument did have basis in the language of the instructions given, even though it runs counter to the well-established principle that "a defendant who comes armed to an interview does not automatically lose his right to self-defense." *Stanley*, 71 M.J. at 72 n.5 (Baker, J, concurring) (citing *United States v. Moore,* 35 C.M.R. 159, 165-66 (C.M.A. 1964)). The end result was that the Defense had no means to offer a meaningful, instruction-based response on its side of this pivotal issue.[30]

Third, we conclude the Defense-requested escalation instructions—whose tailored adjustments would have warded off such one-way conclusions—were on such a vital point in the case that the failure to give them seriously impaired the effective presentation of Appellant's defense of self-defense. As discussed above, the Defense's entire theory of the case revolved around the argument that Appellant sought to deter an attack by threatening deadly force (knives), and only resorted to using such force when the undeterred LCpl V reached for one of the knives. The refusal to give the tailored escalation instructions to fairly and adequately address these contextual nuances—when combined with the trial counsel's misleading arguments on

---

[29] App. Ex. LIX, page 13 (emphasis added).

[30] We note that "the military judge should not give undue emphasis to any evidence favoring one party." *United States v. Damatta-Olivera*, 37 M.J. 474, 478-79 (C.M.A. 1993). But giving an instruction tailored to the evidence presented, even if that evidence may be more favorable to one side, does not necessarily give it *undue* emphasis. The more fundamental requirement is that the trial judge, upon request, must instruct on any issue raised by the evidence "without regard to its source or credibility . . . upon which members might rely if they choose." R.C.M. 920(e), Discussion. In light of this broad requirement, we cannot overemphasize the duty of trial judges to (1) thoroughly examine the evidence from both parties' perspectives, in order to ensure the instructions "*fairly* and *adequately* cover the issues presented . . ." *United States v. Bailey*, 77 M.J. 11, 13-14 (C.A.A.F. 2017) (citations omitted) (emphasis added); and then (2) critically evaluate the instructions from the members' perspective, in order to ensure they "provide an accurate, complete, and *intelligible* statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (emphasis added).

these key issues—severely hampered Appellant's ability to present a complete defense of self-defense.

### 3. Prejudice

As we have found instructional error, we must now test for prejudice. In cases of instructional error regarding self-defense, "because there are constitutional dimensions at play, [Appellant's] claims must be tested for prejudice under the standard of harmless beyond a reasonable doubt." *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006) (citation and internal quotation marks omitted); *see also United States v. Davis*, 76 M.J. 224, 228 (C.A.A.F. 2017). Specifically, "[o]nce it is determined that a specific instruction is required but not given, the test . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Dearing*, 63 M.J. at 484 (citation and internal quotation marks omitted).

Here, the shortcomings of the erroneous instructions "essentially undercut the defense theory and could very well have contributed to the finding of guilty." *United States v. Lewis*, 65 M.J. 85, 89 (C.A.A.F. 2007). While not legally incorrect, the instructions given were simply not complete enough to "provide necessary guideposts for an informed deliberation on the guilt or innocence of the accused." *Dearing*, 63 M.J. at 479 (citation and internal quotation marks omitted). As such, and in light of the competing testimony and other evidence adduced in this case, we are unable to find beyond a reasonable doubt that the instructional error did not contribute to Appellant's conviction. We therefore find prejudice that can only be remedied through reversal.

## III. CONCLUSION

Accordingly, the findings and sentence as approved by the convening authority are **SET ASIDE**. A rehearing is authorized on the charge of attempted voluntary manslaughter and its lesser included offenses.

Chief Judge CRISFIELD, Senior Judges KING, HITESMAN, and TANG, and Judges LAWRENCE, STEPHENS, and STEWART concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

22